Max W. MENUSKIN, et al., Plaintiffs,

v.

Don WILLIAMS, et al., Defendants.

No. 1:92–CV–144.

United States District Court,
E.D. Tennessee,
Chattanooga.

July 31, 1996.

Fred T. Hanzelik, Hanzelik & Associates, Chattanooga, TN, Johnny D. Houston, Jr., for plaintiffs.

Don Williams, Hixson, TN, pro se.

Thomas E. Ray, Ray & Sibley, P.C., Chattanooga, TN, for Vicki Cooke.

Alice Williams, Hixson, TN, pro se.

Marvin B. Berke, Berke, Berke & Berke, Chattanooga, TN, for Cathleen N. Miles.

W. Gerald Tidwell, Jr., W. Gerald Tidwell Jr., P.C., Chattanooga, TN, for Susan Parker.

Richard J. McAfee, Joe A. Conner, Baker, Donelson, Bearman & Caldwell, Chattanooga, TN, for National Title Insurance Agency, J.P. Sartain.

Jack E. Gervin, Jr., Anthony A. Jackson, Chambliss & Bahner, Chattanooga, TN, for First American National Bank.

## MEMORANDUM

COLLIER, District Judge.

Before the Court is the Motion for Summary Judgment filed by Defendants National

Title Insurance Agency ("National Title") and J.P. Sartain ("Sartain") (Court File No. 118). Plaintiffs [1] filed a Response (Court File No. 136). National Title and Sartain filed a Reply (Court File No. 155). Before the Court are also Motions for Summary Judgment filed by Defendant Cathleen N. Miles ("Miles") (Court File No. 24), by Defendant Vicki Cooke ("Cooke") (Court File No. 116), and by Defendant Susan Parker ("Parker") (Court File No. 124). Plaintiffs filed Responses to each of these motions (Court File Nos. 43, 134, and 135, respectively). Cooke filed a Reply (Court File No. 145). For the following reasons, the Court will **GRANT** the motions for summary judgment.

The Court will first provide the relevant facts. The Court will then fully address the motion for summary judgment filed by National Title and Sartain. Lastly, the Court will address the motions for summary judgment filed by Miles, Cooke, and Parker.

## I. FACTS

Beginning in 1989, Plaintiffs became interested in and contracted for the purchase of townhomes constructed by Don Williams Construction Company, Incorporated ("DWCC") in Chattanooga, Tennessee. Plaintiffs met with Don Williams, Cooke, Miles, or Parker, all either the owner or employees of DWCC, when visiting the sites or negotiating to buy the townhomes. Don Williams is the president and co-owner of DWCC with his wife, Alice Williams. Cooke is the daughter of Don and Alice Williams, served as secretary-treasurer of DWCC, and prepared payroll checks and some tax returns, but she was not a director or shareholder of the company. Miles worked for DWCC from January 1987 until September 1989 as an employee who helped sell property at DWCC development sites. Parker

served in a role identical to Miles; she was a sales representative responsible for showing homes and vested with authority to execute sales contracts on behalf of DWCC.[2]

By the middle of 1990, all Plaintiffs had paid cash for the purchase of their townhomes. While the particulars of each Plaintiff's purchase differ, the salient facts of all Plaintiffs' purchases are fairly consistent. Plaintiffs initially discussed the sales contract with either Cooke, Miles, or Parker. In pertinent part, the sales contract reads:

> The Seller agrees to convey said property to the purchaser by general warranty deed free of all encumbrances, except as hereinabove set out, and Seller agrees that any encumbrance not herein excepted will be cleared at the time of closing.

(*See* Court File No. 136, Plaintiffs' Collective Ex. A). When dealing with Cooke, Miles, or Parker, Plaintiffs considered them to be employees of DWCC (*see* Court File No. 123: Ex. 1, Menuskin Dep. 35, 51; Ex. 3, J. Merritt Dep. 16–17, 38, 42; Ex. 8, Newman Dep. 21, 41–42; Ex. 2, Barnes Dep. 20, 23; Ex. 5, M. Phillips Dep. 23, 26; Ex. 9, Dickson [3] Dep. 10–11). These initial meetings occurred at the development sites. As required by the sales contract, Plaintiffs wrote checks made out to DWCC for $1000 as earnest money (*see id.:* Ex. 1, Menuskin Dep. 37; Ex. 2, Barnes Dep. 24; Ex. 3, J. Merritt Dep. 38; Ex. 5, M. Phillips Dep. 20–21). Plaintiffs contend the earnest money included the cost of all legal and title work (Court File No. 136, p. 2). The language of the sales contract does not earmark the earnest money for these expenses (*see id.,* Collective Ex. A); however, Plaintiffs Sarah H. Newman ("Newman") and Judie Merritt both state Parker and Miles, respectively, orally represented that the earnest money included the costs of legal and title work (*id.,* attached Ex.

---

**1.** There are nine Plaintiffs. The Court will refer to an individual Plaintiff when appropriate; otherwise, the Court will refer to Plaintiffs as a group.

**2.** Cooke, Miles, and Parker performed many routine matters in conjunction with the sale of the townhomes, such as touring the development sites, showing home models, and helping Plaintiffs with the decoration of their homes.

**3.** Brenda Dickson ("Dickson") is Plaintiff Elizabeth Wynn's ("Wynn") daughter. Dickson accompanied Wynn during the purchase transactions. Wynn has Alzheimer's disease and cannot recall details of the transactions (*see* Court File No. 123, Ex. 9, Dickson Dep. 7).

9, Newman Dep. 42, 83; Ex. 7, J. Merritt Dep. 55).

The record demonstrates Parker acted on behalf of DWCC and signed some of the sales contracts (Court File No. 125, p. 1), but does not indicate either Cooke or Miles signed any of the sales contracts. Significantly, Plaintiffs do not allege either National Title or Sartain participated in drafting the sales contracts. Plaintiffs also do not allege that the name of either National Title or Sartain appears anywhere in the sales contracts. Some Plaintiffs mention having seen signs or folders, both of which bore National Title's name and logo, during some of the meetings with Parker or Miles (see Court File No. 136, attached Ex. 1, Barnes Dep. 29, 60; Ex. 5, Menuskin Dep. 28–30; Ex. 7, J. Merritt Dep. 15, 53–54; but see Court File No. 123: Ex. 5, M. Phillips Dep. 26–27 (noting she did not see any signs or written literature); Ex. 8, Newman Dep. 49 (same)). During these meetings, though, Plaintiffs did not meet Sartain or anyone else from National Title, think National Title operated an office on the site, or presume DWCC and National Title were in business together (see Court File No. 123: Ex. 1, Menuskin Dep. 40; Ex. 3, J. Merritt Dep. 17, 38–39; Ex. 8, Newman Dep. 64–65; Ex. 2, Barnes Dep. 29, 41; Ex. 5, M. Phillips Dep. 22). Plaintiffs do not offer evidence that any of them ever asked Parker, Miles, Cooke, or anyone else associated with DWCC about the relationship between National Title and DWCC or why National Title's name and logo appeared in the DWCC office.

Some Plaintiffs questioned Cooke, Parker, or Miles about the need for having an attorney present at closing. These Plaintiffs note Cooke, Parker, or Miles would tell them that Don Williams' title company or lawyer was taking care of closing and that they did not need an attorney. No Plaintiff chose to have his or her own attorney at closing. Plaintiff Max. H. Menuskin ("Menuskin") testified to the circumstances of and a typical conversation about closing:

Q: Okay. Where did the closing take place?

A: The sales office on the premises.

Q: Who was present at the closing?

A: Me and Susan Parker.

Q: Anyone else present?

 * * * * * *

A: No....

 * * * * * *

Q: Did you have any communications with Ms. Parker concerning the closing prior to going there that day?

A: Yes, I did.... I asked her what attorney was handling the closing and wouldn't I receive clear title?

Q: What did she say?

A: Yes, and then read me that (indicating).

 * * * * * *

Q: Did she tell you who their attorney was?

A: No.

Q: Did she tell you who "their" was? Was she referring to [DWCC]?

A: Within my price, their attorney took care of all legal documents, and I would receive all the documents at closing.

Q: My question is when you said their attorney, Susan Parker said their attorney, is she referring to Don Williams' attorney?

A: That was my assumption.

Q: Did she tell you who that was?

A: No.

Q: Did she mention anything about National Title?

A: No.

Q: Did you ask her any questions about National Title?

 * * * * * *

A: No.

 * * * * * *

Q: .... [B]ut [Parker] handled the closing,....?

A: Correct.

Q: And in what capacity did you understand she was operating that closing in?

A: Representing Don Williams Construction Company as a sales agent.

(Court File No. 123, Ex. 1, Menuskin Dep. 48, 50–51). Plaintiff Newman's testimony also typifies the closings:

A: .... [A]t the date of the closing[,] there was quite a bit of conversation ..., and I asked [Parker] if there were any liens against the property. And she told me, no, that had all been taken care of, and that I had nothing to be concerned about because the warranty deed said free and clear and unencumbered. And that Don had handled all—Don's—I don't know how she worded it, Don's attorney had handled all the legal work.

Q: Did she identify who this attorney was?

A: No. My only clue to that was that J.P. Sartain's name was stamped on the warranty deed, and it was enclosed in a National Title folder, which made me believe that, in fact, all the legal work had been done.

Q: But you didn't ask her if J.P. Sartain was the lawyer that she was referring to?

A: No. I didn't ask that question.

Q: And you didn't contact J.P. Sartain at any point, did you?

A: No, I did not.

Q: You didn't contact anybody at National Title, did you?

A: No, I did not.

(Court File No. 123, Ex. 8, Newman Dep. 45–46).

All of the closings took place either in the DWCC sales office or at the individual Plaintiff's house (*id.:* Ex. 1, Menuskin Dep. 48; Ex. 3, J. Merritt Dep. 66; Ex. 2, Barnes Dep. 32; Ex. 8, Newman Dep. 42, 50; Ex. 5, M. Phillips Dep. 29; Ex. 9, Dickson Dep. 12). Either Parker, Miles, or Cooke conducted them (*see generally id.*). Neither Sartain nor anyone else from National Title attended the closings. Plaintiffs do not point to an instance where either Parker or Miles repre-

sented that National Title or Sartain were the title company and attorney, respectively, mentioned by them during their discussions with Plaintiffs about closing. Neither Sartain nor anyone else from National Title met or talked with Plaintiffs before, during, or after the closings (Court File No. 120, Sartain[4] Aff. ¶ 13; Court File No. 121, Becky Burchard Aff. ¶ 11; Court File No. 123: Ex. 3, J. Merritt Dep. 66–67; Ex. 8, Newman Dep. 52; Ex. 2, Barnes Dep. 38–39). Plaintiffs do not assert that National Title and Sartain were aware of the representations made by Parker, Miles, and Cooke that a "title company" and an "attorney" were purportedly performing title and legal work on behalf of Plaintiffs.

Plaintiffs first became aware of Sartain's name when they received their warranty deeds (Court File No. 123: Ex. 3, J. Merritt Dep. 70–71; Ex. 8, Newman Dep. 46; Ex. 2, Barnes Dep. 38; Ex. 5, M. Phillips Dep. 29–32). Some Plaintiffs state they received their warranty deeds at closing, while others claim they received them in the mail a few days after payment of the purchase price. Plaintiffs received their warranty deeds in a pink folder, which bore the name and logo of National Title and Sartain's name (*see generally id.*). On the warranty deeds appears a stamped notation, variously located on the documents, which in pertinent part reads: "Prepared by James P. Sartain, Jr., Attorney at Law" (*see* Court File No. 136, Plaintiffs' Collective Ex. B). The warranty deeds also contain the following relevant clause:

Grantor, covenants that it is lawfully seized and possessed of said real estate, has full power and lawful authority to sell and convey the same; that the title thereto is clear, free and unencumbered except as hereinabove mentioned, and Grantor will forever warrant and defend the same against all lawful claims.

(*id.*). The record reflects that Cooke signed at least one warranty deed, that of Menuskin (Court File No. 117, p. 6).

Sartain's responsibilities at National Title included the preparation of or supervision of

---

4. Sartain does mention he wrote a letter to Plaintiffs' attorney on March 13, 1992 (Court File No. 120, ¶ 13). This letter follows all of the closings by at least one year.

the preparation of all legal documents at National Title (Court File No. 120, Sartain Aff. ¶ 3). He states National Title received orders from DWCC only for the preparation of the warranty deeds and no independent requests from Plaintiffs for title insurance or to conduct the closings (*id.* at ¶ 7; *see also* Court File No. 121, Burchard Aff. ¶ 7; Court File No. 147, Don Williams Aff. ¶¶ 5, 6). National Title would not perform a title search on property for which the company had not been asked to furnish title insurance or to conduct the closing; National Title would only provide the basic warranty deed (Court File No. 120, Sartain Aff. ¶ 11; Court File No. 121, Burchard Aff. ¶ 13). For the preparation of the warranty deeds at issue, National Title charged the standard $30 fee per document (Court File No. 120, Sartain Aff. ¶ 10). As prepared, the warranty deeds contained the language necessary to convey title and were in recordable form (Court File No. 119, Hale Aff. ¶ 5).[5]

In March 1991, each Plaintiff received a letter from First American National Bank of Chattanooga ("First American"), which explained that First American had prior liens on the property bought by Plaintiffs and sought foreclosure (*see* Court File No. 136, Plaintiffs' Collective Ex. C; Court File No. 123: Ex. 1, Menuskin Dep. 60; Ex. 2, Barnes Dep. 44; Ex. 3, J. Merritt Dep. 76; Ex. 5, M. Phillips Dep. 34–36; Ex. 8, Newman Dep. 56). Before receiving this letter, Plaintiffs were unaware of the prior liens (*see generally id.*). National Title and Sartain also received notice in March 1991 of First American's intention to foreclose on Plaintiffs' property (Court File No. 120, Sartain Aff. ¶ 5; Court File No. 121, Burchard Aff. ¶ 6). Rather than pay off the First American liens with the money received from Plaintiffs' purchases of the townhomes, DWCC had used

the money for other purposes, including the development of another construction project (*see* Court File No. 123, Ex. 13, Sentencing Hearing Transcript, Testimony of Don Williams, pp. 101–02, 151; *see also* Court File No. 147, Don Williams Aff. ¶ 10).[6] Plaintiffs did not adduce sufficient evidence to indicate National Title and Sartain received any of this money, other than the fees for preparation of the warranty deeds.

Cooke claims she did not know of the financial condition of DWCC, was not aware of the construction loans made by First American, and did not handle or have responsibility for the disposition of the sale proceeds from Plaintiffs (Court File No. 117, p. 6). Miles also contends she did not know about Don Williams' activities, how the townhomes were financed, or that DWCC was in financial trouble (Court File No. 26, ¶ 4, Miles Aff.). Parker states she was unaware of DWCC's financial difficulty and did not know of Don Williams' failure to use the sale proceeds to pay off the First American construction loans (Court File No. 125, p. 1). Don Williams testified he and his wife "were the only ones in the company with knowledge of the financial condition of the company[,] and we were the only ones that controlled the sale proceeds" (Court File No. 116, Ex. 2, Don Williams Aff. ¶ 9). Plaintiffs did not proffer sufficient evidence to support a reasonable inference that either Cooke, Miles, or Parker received any of Plaintiffs' sales proceeds.

National Title performed routine services as a title company for DWCC (*see* Court File No. 121, Burchard Aff. ¶ 10; Court File No. 147, Don Williams Aff. ¶ 13). One of the services performed by National Title for DWCC was the preparation of the prior deeds of trust for First American on the property ultimately bought by Plaintiffs (*see*

---

**5.** Plaintiffs contend the warranty deeds should have contained some sort of disclaimer indicating the extent of the work performed by National Title and Sartain (*see* Court File No. 136, pp. 6–7). Plaintiffs offered proposed expert testimony to that effect. Whether to characterize this proposed testimony as expert remains an issue the Court will address below (*see* Court File No. 157, Report and Recommendation of Magistrate Judge John Y. Powers). However, Plaintiffs do not adequately contest the basic premise that the

warranty deeds as drafted contained language sufficient to convey title and were in recordable form.

**6.** The State of Tennessee brought charges against Don Williams for this activity. Don Williams pleaded guilty to six counts of theft of property and two counts of grand larceny, for which he received a sentence of eight years in prison (*see* Court File No. 130, Collective Ex. 1).

Court File No. 130, Collective Ex. 3; Court File No. 136, Ex. 13, attached Sartain Dep. 19–20; Court File No. 147, Don Williams Aff. ¶ 17). The record reflects that First American in each instance recorded its deeds of trust prior to Plaintiffs' recording of their warranty deeds (Court File No. 130, p. 3); however, the record also reflects some Plaintiffs signed their respective sales contracts before First American recorded its deed of trust on that property (*id.*). The record does not adequately reflect when DWCC asked National Title and Sartain to prepare either the deeds of trust or the warranty deeds.

Don Williams' description of the work performed by National Title for DWCC indicates a standard business relationship between the two entities (*see* Court File No. 147, Don Williams Aff. ¶¶ 4, 5, 8, 11, 13, 14, 16–19). Don Williams states National Title neither held an ownership interest in DWCC, operated an office at the development sites, nor participated in management or control of DWCC (*id.* at ¶ 4; *see also* Court File No. 120, Sartain Aff. ¶ 14; Court File No. 121, Burchard Aff. ¶ 9). National Title charged DWCC the standard rates for the performance of its services (Court File No. 147, Don Williams Aff. ¶¶ 4, 9; Court File No. 120, Sartain Aff. ¶ 10; Court File No. 121, Burchard Aff. ¶ 8). Don Williams never informed anyone associated with National Title that he did not use the sale proceeds from Plaintiffs to pay the First American mortgages (Court File No. 147, Don Williams Aff. ¶¶ 11, 17 (calling it "an independent action on my part"); Court File No. 120, Sartain Aff. ¶¶ 4, 5; Court File No. 121, Burchard Aff. ¶¶ 5, 6). Plaintiffs did not proffer evidence demonstrating an atypical business arrangement between National Title and DWCC in this instance or showing National Title or Sartain knew DWCC did not pay the First American mortgages with the sale proceeds from Plaintiffs. Nor have Plaintiffs offered sufficient evidence to indicate National Title and Sartain illegally benefitted from Don Williams' diversion of Plaintiffs' sales proceeds. Additionally, Plaintiffs have not demonstrated DWCC routinely engaged in similar activity giving rise to a pattern or common practice, nor have Plaintiffs demonstrated National Title and Sartain engaged in similar activity with DWCC on other occasions.

Plaintiffs did not point to affirmative, independent representations made directly by National Title or Sartain to Plaintiffs about their responsibility toward or the status of Plaintiffs' warranty deeds. The evidence in the record indicates DWCC asked National Title only to prepare the warranty deeds, not to perform a title search or furnish title insurance, and only paid for the preparation of warranty deeds. In addition, the evidence presented indicates Cooke, Parker, and Miles alluded to various responsibilities regarding Plaintiffs' closings purportedly assumed by a title company and a lawyer, but they never did directly identify the title company or the lawyer. Plaintiffs did not assert that National Title and Sartain were aware of the representations made by Parker, Miles, and Cooke that a "title company" and an "attorney" were purportedly performing title and legal work on behalf of Plaintiffs.

Moreover, the evidence reveals Cooke, Miles, and Parker made these representations because they thought the information was true. Plaintiffs did not offer direct evidence that Cooke, Parker, and Miles knew of the prior construction liens and knew that neither a title company nor an attorney performed a title search or furnished title insurance. Plaintiffs did not adduce sufficient evidence to indicate Cooke, Parker, and Miles knew Plaintiffs' property was not free and clear of encumbrances at the time of closing. Ultimately, each Plaintiff relied upon the same set of circumstances to formulate his or her belief that National Title, Sartain, Cooke, Miles, and Parker participated in a scheme to defraud them of their money. Plaintiff Menuskin's testimony is representative:

Q: Do you have any facts other than what you've told us today which would substantiate the allegation that J.P. Sartain and National Title intended [to devise a scheme and artifice to defraud Plaintiffs as alleged in paragraph four of the Complaint]?

A: When I received my warranty deed prepared, presumably, by National Ti-

tle and J.P. Sartain, my assumption was that they were the ones that prepared with [DWCC], and they were a party of....

\* \* \* \* \* \*

Q: Okay. Do you have any other facts to substantiate that opinion other than the fact that Mr. Sartain's name appears as it being prepared by on the warranty deed?

A: My warranty of deed is my basis.

\* \* \* \* \* \*

Q: ... With respect to counts nine and ten, ... count nine is for negligent misrepresentation. Again, are there any other facts which you have knowledge of to substantiate the contentions ... that you have not told us about today?

A: My warranty of deed, sir.

Q: Again, nothing else? And I'm not belittling that, that's just—

A: This is sufficient.

(Court File No. 123, Ex. 1, Menuskin Dep. 82–83, 133). Plaintiff Edward L. Merritt describes the representations made by National Title and Sartain as follows:

Q: Did Mr. Sartain or National Title make any direct representations to you concerning whether or not there were any preexisting liens on your property?

A: Just the warranty deed from Mr.— from National Title and Mr. Sartain saying that it's free, clear and unencumbered and we could sell it.

\* \* \* \* \* \*

Q: Okay. The warranty deed is the only document you have?

A: And we relied on that one hundred percent because it has the attorney's name on there and I read every word of it.

(*id.*, Ex. 4, E. Merritt Dep. 50). Plaintiff Mamie Phillips also testified to her reliance on the warranty deed:

Q: The pink sheet that's attached ... reflects National Title Insurance Agency's logo on it, with their name and their address and telephone numbers of their two offices. Also is reflected, "Prepared by James P. Sartain, Jr." Is this the first time that you saw anything with National Title's name on it?

A: Yes, it is.

Q: And also the first time you saw anything with J.P. Sartain's name on it?

A: Yes, it is.

Q: Did you ask any questions to Ms. Cooke about who J.P. Sartain was or what National Title Insurance Company was?

A: No, I didn't, because just seeing that it was prepared by an attorney and it stated that it was free and clear and unencumbered by a title company was all I thought we needed.

Q: Okay. And the connection to the title company was on the pink sheet?

A: Yes, it was.

Q: Did Ms. Cooke make any representations to you who J.P. Sartain was or National Title was?

A: No, she didn't.

Q: Did anyone else at [DWCC] make any representations to you concerning National Title or J.P. Sartain?

A: No, they didn't.

\* \* \* \* \* \*

Q: Mrs. Phillips, would you tell me in your own words what you contend that J.P. Sartain and National Title did wrong in this case?

A: Well, in issuing us a warranty deed that stated free and clear and unencumbered.

(*id.*, Ex. 5, M. Phillips Dep. 32–33, 40; *see also id.:* Ex. 2, Barnes Dep. 38–40, 66–67; Ex. 8, Newman Dep. 45–46, 92–94; Court File No. 136, attached Ex. 7, J. Merritt Dep. 73, 98, 106).

## II. STANDARD OF REVIEW

■ Under *Fed.R.Civ.P.* 56(c), the Court will render summary judgment if there is no genuine issue as to any material fact and the

moving party is entitled to judgment as a matter of law. The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994); *Kentucky Div., Horsemen's Benev. & Prot. Assoc., Inc. v. Turfway Park Racing Assoc., Inc.,* 20 F.3d 1406, 1411 (6th Cir.1994), and the Court must view the facts and all inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Oakland Gin Co., Inc. v. Marlow,* 44 F.3d 426, 429 (6th Cir.1995); *City Management Corp. v. U.S. Chemical Co., Inc.,* 43 F.3d 244, 250 (6th Cir.1994).

Once the nonmoving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Lansing Dairy,* 39 F.3d at 1347; *Horsemen's Benev.,* 20 F.3d at 1411; *see also Guarino v. Brookfield Township Trustees,* 980 F.2d 399, 404–06 (6th Cir.1992) (holding courts do not have the responsibility *sua sponte* to search the record for genuine issues of material fact). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53.

The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *60 Ivy Street Corp. v. Alexander,* 822 F.2d 1432, 1435–36 (6th Cir.1987). The standard for summary judgment mirrors the standard for directed verdict. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2511. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fairminded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.;* Lansing Dairy, *39 F.3d at 1347;* Horsemen's Benev., *20 F.3d at 1411.*

## III. CLAIMS AGAINST NATIONAL TITLE AND SARTAIN

Plaintiffs bring several causes of action against National Title and Sartain. These claims include: negligence, gross negligence, fraud, negligent misrepresentation, violation of the Tennessee Consumer Protection Act ("TCPA"), *Tenn.Code Ann.* §§ 47–18–101 through 47–18–121, breach of contract, breach of warranty, civil conspiracy, violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, and infliction of emotional distress. Each claim asks the same questions: What was the relationship between National Title, Sartain, and DWCC? What were the contacts made or representations given by National Title and Sartain to Plaintiffs?

### A. RICO

Plaintiffs have not sustained a civil RICO claim under 18 U.S.C. § 1962(c). Section 1962(c) provides in pertinent part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt.

*Vemco, Inc. v. Camardella,* 23 F.3d 129, 133 (6th Cir.1994) (quoting Section 1962(c)). To establish a violation of Section 1962(c), the United States Court of Appeals for the Sixth Circuit broadly requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Kenty v. Bank One, Columbus, N.A.,* 67 F.3d 1257, 1262 (6th Cir.1995). More precisely, "[a] defendant's

participation must be in the conduct of the affairs of a RICO enterprise, which will ordinarily require some participation in the operation or management of the enterprise itself." *Stone v. Kirk*, 8 F.3d 1079, 1091 (6th Cir.1993) (quoting *Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir.) (en banc), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983)).

▮ The *Stone* court followed the analysis given by *Reves v. Ernst & Young*, 507 U.S. 170, 177, 113 S.Ct. 1163, 1169, 122 L.Ed.2d 525 (1993) ("The narrow question in this case is the meaning of the phrase 'to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs.'"). *See Stone*, 8 F.3d at 1091–92. In *Reves*, the United States Supreme Court defined "participate" as more narrow than "aid and abet," which the Court defined as "comprehend[ing] all assistance rendered by words, acts, encouragement, support, or presence." *Reves*, 507 U.S. at 178, 113 S.Ct. at 1170.

> In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs. Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* (internal footnote omitted). For liability to attach under Section 1962(c), "one must participate in the operation or management of the enterprise itself." *Id.* at 185, 113 S.Ct. at 1173.

This reasoning is dispositive. Even though the Court recognized "lower-rung participants in the enterprise *who are under the direction of upper management*" and people "associated with" the enterprise, such as people who exert influence over the enterprise by bribery, may operate or participate in the management of an enterprise, *id.* (emphasis added), neither situation applies here. National Title did not have an office at the development sites. Neither Sartain nor anyone else from National Title served as an

officer or manager of DWCC. Plaintiffs did not proffer evidence that National Title or Sartain ever helped formulate decisions or guide policy for DWCC. Plaintiffs have not shown National Title and Sartain did anything more than provide standard, routine services for DWCC. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 521–22 (2nd Cir. 1994) (dismissing RICO claim against attorney who "acted as no more than [an] attorney"); *Baumer v. Pachl*, 8 F.3d 1341, 1344–45 (9th Cir.1993) (dismissing RICO claim against an attorney whose "role was limited to providing legal services"). In addition, Plaintiffs did not adduce evidence sufficient to support a finding that National Title and Sartain received any of the proceeds from Don Williams' illegal activities, beyond payment for preparation of the warranty deeds.

▮ To sustain a RICO claim, Plaintiffs must also "plead sufficient facts to establish the existence of a 'pattern' of racketeering activity." *Camardella*, 23 F.3d at 133. A pattern requires at least two predicate acts and "is not automatically established ... by a large number of unrelated acts; the acts must be ordered and arranged so as to exhibit 'relatedness' and 'continuity.'" *Id.* (citations omitted). The continuity prong focuses RICO's reach on long-term criminal conduct. *See id.* at 133–34 (addressing the "threat of continuing criminal activity"). That Plaintiffs failed to show National Title and Sartain participated in the operation or management of DWCC precludes establishing a threat of continuing criminal activity.

▮ Plaintiffs allege the predicate acts were the mailings of at least two of the warranty deeds. It was National Title and Sartain who purportedly mailed the warranty deeds. Plaintiffs did not allege the participation of any other title company or attorney in the alleged racketeering activity and, given the facts of this case, the participation of a complicitous party is necessary for establishing the continuity prong of a pattern of racketeering activity. *See United States v. Hudson*, 52 F.3d 326 (table), No. 93–2601, 1995 WL 234680, at p. *2 (6th Cir. April 20, 1995) ("An enterprise is a 'group of persons associated together for a common purpose of engaging in a course of conduct' ...") (cita-

tion omitted); *see also Vild v. Visconsi,* 956 F.2d 560, 569–70 (6th Cir.1992) (discussing ways of establishing continuity). Moreover, Plaintiffs did not allege facts upon which the Court could find DWCC perpetrated similar activities in the past. Although DWCC's alleged actions affected six plaintiffs over a period of roughly one year, the facts reveal only an isolated, short-lived scheme. *See Thompson v. Paasche,* 950 F.2d 306, 311 (6th Cir.1991) (finding no continuity where a single scheme involved the fraudulent sale of nineteen lots of land). Accordingly, the Court finds Plaintiffs did not meet their burden under the summary judgment standard as to the RICO claim.[7]

## B. Negligence and Gross Negligence

 Three elements are necessary for the existence of a negligence cause of action "(1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff which was proximately caused by the defendant's breach of a duty." *Dooley v. Everett,* 805 S.W.2d 380, 383 (Tenn.Ct.App.1990). In negligence cases, the duty always is "to conform to the legal standard of reasonable conduct in the light of the apparent risk." *Id.* at 384 (citation omitted). A duty exists if,

> upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of others—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.

*Lindsey v. Miami Development Corp.,* 689 S.W.2d 856, 858–59 (Tenn.1985) (citation omitted).

 National Title and Sartain contend they have no duty of care toward Plaintiffs. Any duty that may have arisen, they argue, would necessarily have stemmed from Sartain's preparation of the warranty deeds (Court File No. 130, p. 12). Given Plaintiffs'

allegations and the facts, the Court agrees. The facts indicate DWCC requested National Title only to prepare the warranty deed, *not* to conduct a title search, *not* to furnish title insurance, and *not* to conduct the closings. When asked only to prepare a warranty deed, National Title's standard procedure does not include a title search or title insurance.

Clearly, neither National Title nor Sartain made independent, affirmative representations to Plaintiffs *before* closing because no Plaintiff ever knew the identity of the "title company" and the "lawyer" referred to by Miles, Parker, or Cooke. That Plaintiffs learned of their identities at closing does not imbue life into the putative representations *made by Miles, Parker, or Cooke* before closing. Moreover, Plaintiffs' linking of the National Title name and logo *seen before closing* and the representations made by Miles, Parker, or Cooke before closing with the identity of National Title revealed at closing is a result of Plaintiffs' own inferences rather than independent representations made by National Title or Sartain. Plaintiffs cannot avoid the fact that they never once met with or talked with Sartain or anyone else from National Title. Plaintiffs cannot avoid the fact that Miles, Parker, or Cooke made the only representations concerning title and legal work and even those representations did not identify the title company and the lawyer. As noted above, Plaintiffs do not assert that National Title and Sartain were aware of the representations made by Parker, Miles, and Cooke that a "title company" and an "attorney" were purportedly performing title and legal work on behalf of Plaintiffs.

National Title and Sartain cite two cases the Court finds persuasive. In *United American Bank of Memphis v. Gardner,* 706 S.W.2d 639 (Tenn.Ct.App.1985), the plaintiff bank brought suit in tort against the defendant title insurance company and its attorney for failing to promptly record a release deed.

---

7. The RICO claim is dismissed as to all Defendants. As discussed *infra,* Plaintiffs did not demonstrate Cooke, Parker, and Miles actively participated in a RICO enterprise because they were unaware of Don Williams' fraudulent scheme. Though the dismissal of the RICO claim, the only federal cause of action pleaded, would under many circumstances prompt the Court to decline jurisdiction because of the predominate nature of the remaining state law claims, that is not so here. Given the longevity of the case, the Court finds this an appropriate opportunity to exercise its supplemental jurisdiction under 28 U.S.C. § 1367.

*Id.* at 640. The plaintiff had begun the piecemeal purchase of a note at that time secured by a second mortgage or trust deed on real property. *Id.* at 640–41. Prior to plaintiff's purchase of 100% of the note, the owner of the secured real property sold it. *Id.* at 641. The note's seller executed a release on the second mortgage, and the real property's new owner hired the defendant to issue a title policy commitment. *Id.* The defendant received the release before the plaintiff purchased 100% of the note, but failed to record the release until after the plaintiff owned the entire note. *Id.* The court denied that the action sounded in tort because of the lack of a duty owed by the defendant, the title insurance company hired by the buyer of the formerly mortgaged real property, to the plaintiff, the purchaser of a note formerly secured by the mortgaged real property. *See id.* at 642–43.

Defendants also cite *Winstead v. First Tennessee Bank N.A., Memphis,* 709 S.W.2d 627 (Tenn.Ct.App.1986) (concerning a purchaser's failure to know zoning restrictions); *see also Herman v. The Farmington Group,* No. 02A01–9207–CV–00189, 1993 WL 90361, at pp. *2–*3 (Tenn.Ct.App. March 30, 1993) (applying *Winstead*). In *Winstead,* the court explained the responsibilities of a purchaser of real property.

> [I]f a purchaser of real property has notice or with ordinary diligence should have had notice of a problem with the real estate, the purchaser cannot attack the validity of the contract for fraud, misrepresentation, or concealment of that problem.

*Winstead,* 709 S.W.2d at 631 (noting the information in question was "available and accessible to all parties"). Such reasoning applies here. The information Plaintiffs needed was available and accessible to them. Moreover, that Plaintiffs' chose to rely upon DWCC and not to verify for themselves the status of their property did not result from anything National Title or Sartain did. Rather, Plaintiffs chose to rely upon the statements made by Cooke, Parker, and Miles, who represented that a "title company" and an "attorney" were performing all necessary title and legal work on the warranty deeds.[8]

It is also significant that some Plaintiffs asked whether they should have an attorney present at closing. At least these Plaintiffs were not ignorant of the need to have someone more knowledgeable about real estate transactions represent their interests. Plaintiffs seem to recognize this:

> While the plaintiffs were not experts in the field of real estate transactions, their life experiences and educational backgrounds indicate that neither were they prone to enter transactions of this magnitude by whim, and without some assurance of legitimacy.

(Court File No. 136, p. 26). Yet no Plaintiff chose to have an attorney present. Although Plaintiffs chose not to hire separate attorneys because of their trust in and reliance upon DWCC and its representations, the Plaintiffs were still adverse parties of DWCC. *See Schlecht v. Smith,* No. 92–30099–MAP, 1994 WL 621594, at pp. *7–*8 (D.Mass. Nov. 7, 1994) (discussing a party's decision to rely upon counsel of an adverse party in a business transaction). In *Schlecht,* the court found the adverse party's attorney did not owe a separate, enforceable duty to both parties. 1994 WL 621594, at p. *5. Such is the case here. DWCC hired National Title and Sartain only for a limited, definable purpose: simple preparation of the warranty deeds. Thus, their first and obvious duty was to DWCC. Plaintiffs have not shown National Title and Sartain were aware Miles, Parker, and Cooke implicated them for a second and unapparent duty.[9]

As for the gross negligence claim, Tennessee courts first require the facts properly to support a finding of negligence. *Linden v. American Storage Park,* C.A. No. 877, 1990 WL 6836, at p. *4 (Tenn.

---

8. As noted above, Plaintiffs do not assert that National Title and Sartain were aware of the representations made by Parker, Miles, and Cooke that a "title company" and an "attorney" were purportedly performing title and legal work on behalf of Plaintiffs.

9. *See infra* Section III. C., D., E. regarding, respectively, the fraud, TCPA, and negligent misrepresentation claims.

Ct.App. Jan. 31, 1990). Given the application of case authority to the facts of this case, as discussed above, the Court finds Plaintiffs did not meet their burden under the summary judgment standard as to the negligence claim. Thus, the gross negligence claim fails as well. Assuming *arguendo* a finding of negligence, the facts of this case do not show National Title and Sartain acted "with utter unconcern for the safety of others, or . . . with such a reckless disregard for the rights of others," *id.*, or from "a conscious neglect of duty or a callous indifference to consequences. . . . [or] such entire want of care as would raise a presumption of a conscious indifference to consequences," *Buckner v. Varner*, 793 S.W.2d 939, 941 (Tenn.Ct.App. 1990). Accordingly, Plaintiffs fail to sustain both the negligence and gross negligence claims against National Title and Sartain.

## C. Fraud

 "The elements of fraud are an intentional misrepresentation with regard to a material fact; knowledge of the representation's falsity, i.e., it was made 'knowingly' or 'without belief in its truth' or 'recklessly' without regard to its truth or falsity; the plaintiff reasonably relied on the misrepresentation and suffered damages; and the misrepresentation relates to an existing or past fact." *Oak Ridge Precision Industries, Inc., v. First Tennessee Bank Nat. Ass'n*, 835 S.W.2d 25, 29 (Tenn.Ct.App.1992). Plaintiffs' claim of fraud fails because the facts show National Title and Sartain did not know of Don Williams' use of the sale proceeds for other purposes nor did they make an intentional misrepresentation.

Plaintiffs imply National Title and Sartain should have been aware of Don Williams' actions, or at least aware of the encumbered status of the property, because of Sartain's preparation of the deeds of trust for First American. While the simple chronology of events lends support for that implication, Plaintiffs have not linked Sartain's preparation of the deeds of trust or of the warranty deeds with any sort of fraudulent intent on his part. Don Williams testified he told no one that he did not intend to use or in fact did not use Plaintiffs' sale proceeds to service the First American mortgage. Nor do the facts reveal National Title and Sartain would have reason to know this because of an illegal or unique business relationship with DWCC, which would have included, for example, the receipt of kickbacks. Plaintiffs have not proffered evidence of past misconduct that would have put National Title and Sartain on notice either of Don Williams' intended scheme or of the more narrow fact that the title would not be free and clear of all encumbrances by closing.[10] In the absence of evidence to the contrary, the Court cannot impute knowledge to National Title and Sartain based upon inference and speculation.[11]

The facts do show DWCC retained National Title and Sartain only to prepare the warranty deeds and not to insure title, run a title search, or conduct the closings. In addition, National Title and Sartain never met or talked with Plaintiffs and, thus, did not affirmatively and independently represent to Plaintiffs anything regarding the warranty

---

10. As noted above, Plaintiffs do not allege National Title and Sartain had anything to do with the sales contract. It is significant that the sales contract reads, in pertinent part:

> The Seller agrees to convey said property to the purchaser by general warranty deed free of all encumbrances, except as hereinabove set out, and *Seller agrees that any encumbrance not herein excepted will be cleared at the time of closing.*

(*See* Court File No. 136, Plaintiffs' Collective Ex. A) (emphasis added). This clause puts the onus of providing a clear title upon the seller, DWCC, and gives DWCC up to the time of closing to fulfill that duty. Presumably, even a title search conducted two days before closing that showed a prior lien would still allow a seller in circumstances such as these *up to the time of closing* to provide clear title.

11. Plaintiffs have not adduced evidence to indicate the practice of providing clear title *by closing* is anything but standard procedure. A case cited by Cooke supports this conclusion. In *Citizens Savings and Loan Assoc. v. Fischer*, 67 Ill. App.2d 315, 214 N.E.2d 612, 614 (1966), the court found "that as a matter of policy of the corporation, construction loans were not shown on their contracts of sale because they paid them off after a sale and [the] salesman had no knowledge as to whether the properties were mortgaged or not, but that [he] was carrying out his orders when he advised the purchasers that no mortgage existed on the property they were buying and that they could depend on [the seller]."

deeds. Without the necessary representation of a known or suspected falsity, there can be no fraud. Accordingly, Plaintiffs did not meet their burden under the summary judgment standard as to the fraud claim.

### D. TCPA

■■■■ Similarly, Plaintiffs' claims under the TCPA fail. First, the TCPA covers real estate transactions. *Klotz v. Underwood,* 563 F.Supp. 335, 337 (E.D.Tenn.1982), *aff'd,* 709 F.2d 1504 (6th Cir.1983). Second, National Title and Sartain correctly characterize Plaintiffs' claims under the TCPA as requiring affirmative action on the part of the defendant. *See Tenn.Code Ann.* § 47–18–104(b)(2) ("causing"), (b)(5) ("representing"), (b)(17) ("advertising"), (b)(19) ("representing"), and (b)(27) ("engaging"); *see also Klotz,* 563 F.Supp. at 339 (noting a failure to disclose is not fraudulent where seller had no knowledge of defects); *Groover v. Torkell,* 645 S.W.2d 403, 409 (Tenn.Ct.App.1982) (noting "the concept of 'deceptive' carries with it an element of intent"). On the other hand, Plaintiffs offer little debate and state "[t]he legal theories [applicable to these claims] will not be explored presently" (Court File No. 136, p. 36). Given Plaintiffs' failure to demonstrate National Title and Sartain made affirmative, independent representations about the warranty deeds, Plaintiffs did not meet their burden under the summary judgment standard, and there can be no violation of the TCPA as pleaded by Plaintiffs.

### E. Negligent Misrepresentation

■■■ To analyze negligent misrepresentation claims, the Tennessee Supreme Court adopted the principles of the *Restatement (Second) of Torts* (1977), § 552 ("Section 552") in *Tartera v. Palumbo,* 453 S.W.2d 780, 784–85 (Tenn.1970) (dispensing with the privity requirement). Thus, in cases where the plaintiff alleges the defendant negligently supplied information intended for the guidance of others, Section 552 provides the pertinent analysis:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in the obtaining or communicating of the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1), is limited to loss suffered
>
>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

*John Martin Co. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 431 (Tenn.1991) (quoting Section 552). This standard imposes liability in tort in the absence of privity when:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and
>
> (2) the defendant supplies faulty information meant to guide others in their business transaction; and
>
> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and
>
> (4) the plaintiff justifiably relies upon the information.

*Id.* Applying Section 552 and other relevant case authority, the Court finds Plaintiffs do not sustain their negligent misrepresentation claim.

■■■ As noted above, Plaintiffs contend the warranty deeds serve as the representation given by National Title and Sartain. Not having proffered evidence of any additional representation, except perhaps their visual notation of National Title's name and logo and Sartain's name, Plaintiffs rely solely upon the warranty deed. The Court must determine, then, what National Title and Sartain represented to Plaintiffs through the

warranty deed and whether that representation gives rise to a duty toward Plaintiffs.

In *Stinson v. Brand,* 738 S.W.2d 186 (Tenn.1987), the Tennessee Supreme Court found Section 552 applied to a law firm's involvement in a real estate transaction. In *Stinson,* a buyer of property requested its law firm, the defendant, to perform a title search and prepare the appropriate legal documents to convey the property. *Id.* at 188. The plaintiff seller went to the defendant's law offices with the buyer, met with the law firm's secretary, and executed the documents. *Id.* As requested by the buyer, the deeds of trust left the name of the grantee blank. *Id.* The defendant paid the back taxes with a check given it by the plaintiff seller. *Id.* The deeds listed one of the attorneys at the law firm as trustee and bore a stamped legend of the names of the law firm and the attorneys, indicating they had prepared the deeds. *Id.* at 190–91. The plaintiff did not record the deeds of trust. *Id.* at 188–89 (finding the defendant law firm did not give the plaintiff instructions to record the deeds).

Ultimately, the buyer resold the property, never paid the seller's note, and then filed bankruptcy. *See id.* at 189–90. Even though the defendant law firm only billed the buyer of the property, the court found the facts supported an inference that the law firm could have also charged the plaintiff seller for its services. *Id.* at 189–90. The court stated the law firm and its lawyers "so far involved themselves in the transaction that a trier of fact could find that they were representing multiple interests." *Id.* at 190. The court warned of the "complex and delicate" nature of real estate transactions, but found where attorneys intend to charge all parties involved, "there is nothing unusual or harsh in requiring the exercise of reasonable care toward all concerned." *Id.* at 191.

In *Collins v. Binkley,* 750 S.W.2d 737, 739 (Tenn.1988), the court narrowed *Stinson* and held that Section 552 liability can attach to an attorney even if no attorney-client relationship existed. In *Collins,* a seller of property asked the defendant attorney to prepare the warranty deeds necessary to convey title. *Id.* at 737. The defendant reviewed the warranty deeds for accuracy and admitted knowing that for a warranty deed to be recordable, it had to have a complete acknowledgement. *Id.* at 737–38. The deeds he prepared lacked a complete acknowledgement. *Id.* at 738. The failure to include a correct acknowledgement clearly rendered the deeds invalid for recording. *Id.* Both the defendant and a witness for the plaintiff testified to the applicable standard of care and recognized the defendant's actions did not meet that standard. *See id.* In light of evidence the defendant knew the plaintiff would rely on him, the defendant's own recognition of his responsibility, and the applicable standard of care, the court found Section 552 applied. *Id.* at 739 (finding liability under Section 552 a jury question).

Although there is no attorney-client relationship in the case before the Court, as in *Collins,* both *Stinson* and *Collins* offer guidance. *Stinson* calls for a broad review of the facts that may lead to liability under Section 552, while *Collins* focuses on a clearly defined standard of care and the defendant's implicit recognition of his breach of that standard. It cannot be said that National Title and Sartain approached the level of involvement in the real estate transactions comparable to the defendants in *Stinson. See also John Martin Co.,* 819 S.W.2d at 429–30 (discussing the defendant's level of supervision and control). Nor can it be said that there was anything facially defective with the warranty deeds: they were in recordable form.

Plaintiffs argue National Title and Sartain should have stamped a disclaimer on the warranty deeds providing some indication that National Title and Sartain relied on information provided by DWCC.[12] Plaintiffs do not cite Tennessee case precedent or statutory authority for support. National Title and Sartain contend they complied with Ten-

---

12. The one clear disclaimer Plaintiffs suggest is one allegedly used in the past by National Title, which reads: "This instrument was prepared from information furnished by the parties herein for which the preparer assumes no responsibility" (Court File No. 136, p. 17). However, the Court understands Plaintiffs also to argue that any language putting the buyer on notice would have sufficed (*Id.* at pp. 6–7, 16–17).

nessee law by stamping the "prepared by" language on the warranty deeds in accordance with *Tenn.Code Ann.* § 66–24–115. *See* Section 66–24–115(a)(2) ("An instrument will be in compliance herewith if it contains a statement in the following form: 'This instrument was prepared by (name) _____ (address) _____ . . . .' "). Neither party proffered case authority or legislative history addressing this statute. The Court finds the "prepared by" language stamped on the warranty deeds by National Title and Sartain complies with Section 66–24–115(a)(2).

Plaintiffs offer proposed expert testimony to the effect that a title company preparing a warranty deed on a piece of property after having recently prepared a deed of trust on the same piece of property should include a disclaimer on the warranty deed and the failure to do so violates the standard of care (Court File No. 136, pp. 6–7, 16–17). Even assuming Plaintiffs' proposed expert is correct, Plaintiffs' fail to link the absence of the disclaimer with the ultimate injury. As noted above, Plaintiffs do not allege National Title and Sartain had anything to do with the sales contract. It is significant that the sales contract reads, in pertinent part:

> The Seller agrees to convey said property to the purchaser by general warranty deed free of all encumbrances, except as hereinabove set out, and *Seller agrees that any encumbrance not herein excepted will be cleared at the time of closing.*

(*See id.,* Plaintiffs' Collective Ex. A) (emphasis added). This clause puts the onus of providing a clear title upon the seller, DWCC, and gives DWCC up to the time of closing to fulfill that duty. Presumably, even a title search conducted two days before closing that showed a prior lien would still allow a seller in circumstances such as these *up to the time of closing* to provide clear title.[13] Plaintiffs' obvious recourse would have been to go to DWCC, not National Title and Sartain.

The *John Martin Co.* court provides an additional key to the analysis:

The defendant is only liable to those, whether in contractual privity or not, for whose benefit and guidance the information is supplied. The information may be either direct or indirect. In that regard, the foreseeability of use is critical to liability. . . . *[C]ourts have been careful to limit liability to only those whose use of the information is reasonably foreseeable.*

*John Martin Co.,* 819 S.W.2d at 431–32 (emphasis added) (citing *Restatement (Second) of Torts,* § 552 Comments). Neither Tennessee case authority nor the parties adequately address this particular issue.

The United States Court of Appeals for the First Circuit recently addressed a fact pattern similar to the one before the Court. In *One National Bank v. Antonellis,* 80 F.3d 606 (1st Cir.1996) (applying Massachusetts law), the defendant attorney recorded a second mortgage but failed to record a known first mortgage on a title certificate requested by his client. *Id.* at 607. The title certificate contained a clause, which certified the mortgagors held the property "free from all encumbrances, and the mortgagee [held] a good and sufficient record first mortgage to the property." *Id.* The certificate also disclaimed use of it "without the express written permission" of the defendant attorney. *Id.* at 607–08. A later non-client purchaser of a package of mortgages, which included the second mortgage, found that mortgage subordinate to the first mortgage. *Id.* at 608.

After noting attorneys generally owe a duty only to clients, the First Circuit reviewed whether the "foreseeable reliance" exception to the general rule applied. First, an attorney owes a duty only to non-clients "who the attorney knows will rely on the services rendered." *Id.* at 609 (citation omitted). Actual reliance is insufficient: "[i]t must be shown that *the attorney should reasonably foresee* that the nonclient will rely upon him for legal services." *Id.* (emphasis added) (citation omitted). Second, courts "will not *impose a duty of care* on an attorney if such an independent duty would potentially conflict with the duty the attorney owes

---

13. *See Fischer,* 214 N.E.2d at 614 (discussing corporate policy of paying off construction loans

after the sale).

to his or her client." *Id.* (citation omitted). An actual conflict is not necessary. "[I]t is the potential for conflict that prevents the imposition of a duty." *Id.* (citation omitted). The *Antonellis* plaintiff claimed the defendant attorney owed the same duty to it as to the attorney's client: "the duty to search properly and to report accurately the state of the title." *Id.* at 610.

Significantly, courts applying the foreseeable reliance exception do so in light of an attorney's ethical obligation of confidentiality. In fact, "an attorney's duty to third parties is circumscribed and limited by the law and the disciplinary rules governing attorney conduct." *Id.* (quoting *Schlecht*, 1994 WL 621594, at p. *5). The duty of confidentiality requires the attorney to "preserve the confidences and secrets" of a client. *Id.* (citing Canon 4, DR 4–101). The Tennessee Supreme Court adopted the Code of Professional Responsibility in Rule 8 of the Rules of the Supreme Court. *See* Rules of the Supreme Court, Rule 8, Canon 4 ("A Lawyer Should Preserve the Confidences and Secrets of a Client").

The United States Court of Appeals for the Fifth Circuit also acknowledged the importance of the attorney-client relationship. *See Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1124–25 (5th Cir.1988) (reviewing an alleged securities violation). The Fifth Circuit stated "that any significant increase in attorney liability to third parties could have a dramatic effect upon our entire system of legal ethics." *Id.* at 1124 (emphasizing attorney-client confidences and loyalty).

> [T]he law, as a general rule, only rarely allows third parties to maintain a cause of action against lawyers for the insufficiency of their legal opinions. In general, the law recognizes such suits only if the non-client plaintiff can prove that the attorney prepared specific legal documents that represent explicitly the opinion of the attorney preparing them, for the benefit of the plaintiff.

*Id.* at 1124; *see also id.* at 1124 n. 20 ("This rule, which a growing number of states have adopted for imposing liability for negligently-rendered opinions, reflects the increasing influence of [Section 552].").

Plaintiffs were buyers of and DWCC was the seller of real estate. DWCC requested that National Title and Sartain prepare the warranty deeds for the real estate transactions; the documents met the minimum requirements for recording. DWCC did not request from National Title and Sartain a title search, title insurance, or assistance conducting the closings. Miles, Parker, and Cooke did not clearly and directly identify National Title and Sartain as the title company and attorney purportedly performing the necessary title and legal work. Plaintiffs do not assert that National Title and Sartain were aware of the representations made by Parker, Miles, and Cooke that a "title company" and an "attorney" were purportedly performing title and legal work on behalf of Plaintiffs. In apparent reliance upon the statements by Miles, Parker, and Cooke, Plaintiffs chose not to have attorneys, not to have the titles searched, and not to purchase title insurance. Neither Sartain nor anyone else from National Title met or talked with Plaintiffs before the closings.

DWCC conducted the closings at its offices or at Plaintiffs' homes. Neither Sartain nor anyone else from National Title attended the closings. Plaintiffs received their warranty deeds either at closing or a few days later by mail. Plaintiffs claim they relied upon the language of the warranty deeds in their belief that the property was free and clear of encumbrances. Plaintiffs' reliance upon the warranty deeds rested upon an assumption that the "title company" and "attorney," referred to but never identified by DWCC, had performed all of the necessary title and legal work, as represented by Miles, Parker, and Cooke. Plaintiffs contend that seeing the names of National Title and Sartain on the folder holding the warranty deeds and the warranty deeds itself bolstered their assumption.

Several reasons dictate against potential liability for National Title and Sartain based upon a negligent misrepresentation theory. First, *Stinson* suggests courts should evaluate all of the connections between a non-client and an attorney in a real estate transaction. Second, *Collins* implies the need for a clearly defined breach of a standard of care

and resultant causation before finding an attorney liable to a non-client. Third, the Court's analysis in the Memorandum pertinent to negligence concluded National Title and Sartain did not owe Plaintiffs a duty and recognized Tennessee case authority charges Plaintiffs with knowledge of the conditions of real property they intend to buy that is accessible and available. Fourth, Plaintiffs' failed to show the absence of the disclaimer caused their injury. Fifth, any suggested misrepresentation given by National Title and Sartain resulted not from their own motivation but from that of Don Williams. Lastly, the importance of preserving attorney-client confidences cautions against expanding attorney liability to non-clients. Accordingly, the Court finds Plaintiffs did not meet their burden under the summary judgment standard as to the negligent misrepresentation claim.

### F. Breach of Contract and Breach of Warranty

Plaintiffs articulate their breach of contract claim as follows:

> [T]he defendants *have made material misrepresentations* designed to induce the plaintiffs to rely on the warranty deeds, which were represented as valid and trustworthy. The deeds proved not to convey proper title, and it was *those misrepresentations* made by the defendants that convinced the plaintiffs to enter into the transactions without further question. Hence, the defendants are not only in breach of their own contract to supply true and correct warranty deeds, but they have become parties to the [DWCC] sales contracts by inducing the plaintiffs, *through fraudulent and misrepresented statements,* to enter them without question.

(Court File No. 136, pp. 34–35) (emphasis added). Plaintiffs articulate their breach of warranty claim as follows:

> For the same reasons that are stated for breach of contract above, the plaintiffs reasonably relied on *the affirmations of the defendants* in closing their purchase contracts for property. The defendants, *by misrepresenting,* both negligently and fraudulently, that the property was freely transferrable and without liens, became parties to the breach of the contract and are liable for any damages thereto. Since it has become abundantly clear that those contracts have been breached, the warranties maintained by the defendants are also breached.

(*Id.* at 36) (emphasis added). Plaintiffs thus link their breach of warranty claim to the breach of contract claim and provide no separate or different legal authority for the breach of warranty claim.

 Plaintiffs cite *Restatement (Second) of Contracts* §§ 162 ("When a Misrepresentation is Fraudulent or Material") and 164 ("When a Misrepresentation Makes a Contract Voidable") in support of their claim; they do not cite any case authority. This argument is essentially the same as that made for the fraud and negligent misrepresentation claims, that is, National Title and Sartain *misrepresented* the state of the titles by providing warranty deeds that included language indicating the property was free and clear of encumbrances. The *Restatement (Second) of Contracts* defines a misrepresentation as follows:

> (1) A misrepresentation is fraudulent or material if the maker intends his assertion to induce a party to manifest his assent and the maker
>
> > (a) knows or believes that the assertion is not in accord with the facts, or
> >
> > (b) does not have the confidence that he states or implies in the truth of the assertion, or
> >
> > (c) knows that he does not have the basis that he states or implies for the assertion.
>
> (2) A misrepresentation is material if it will be likely to induce a reasonable person to manifest his assent, or if the maker knows that it will be likely to induce the recipient to do so.

*Restatement (Second) of Contracts* § 162.

As discussed throughout the Memorandum, the Court does not find National Title and Sartain made independent, affirmative representations to Plaintiffs. National Title and Sartain never met or talked with Plaintiffs and did not know of Don Williams' ille-

gal activities. Plaintiffs have not argued that National Title and Sartain knew of Miles', Parker's, and Cooke's representations to Plaintiffs about the "title company" and "attorney" who were purportedly performing title and legal work on behalf of Plaintiffs. For these and the other reasons previously made, the Court finds Plaintiffs did not meet their burden under the summary judgment standard as to the breach of contract and breach of warranty claims.

### G. Civil Conspiracy

█ Tennessee courts define the cause of action for civil conspiracy as follows:

A civil conspiracy is a 'combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means.' ... The requisite elements of the cause of action are common design, concert of action, and an overt act.... Injury to person or property, resulting in attendant damage, must also exist.

*Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn.Ct.App.1993) (citations omitted).

█ Plaintiffs have not demonstrated National Title and Sartain participated, in combination with DWCC, in a common design to defraud Plaintiffs of their property or otherwise cause harm to them or their property. Given the similar analyses of the civil conspiracy claim and the RICO and fraud claims, the Court finds Plaintiffs did not meet their burden under the summary judgment standard.

### H. Intentional Infliction of Emotional Distress

█ To sustain a claim of intentional infliction of emotional distress, Plaintiffs must show that

(1) the conduct of the defendants has been so outrageous in character, and so extreme in degree, as to be beyond the pale of

decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury.

*Swallows v. Western Electric Co., Inc.*, 543 S.W.2d 581, 582 (Tenn.1976); *see also Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977). At this stage, it is the Court's responsibility to determine whether the alleged conduct rises to the level of outrageousness, so as to warrant trial on the issue. *Swallows*, 543 S.W.2d at 583; *see also Claiborne v. Frito–Lay, Inc.*, 718 F.Supp. 1319, 1322 (E.D.Tenn.1989). Given the facts of this case and the analyses of the other causes of action brought by Plaintiffs, the Court finds Plaintiffs did not meet their burden under the summary judgment standard as to the intentional infliction of emotional distress claim.

### IV. CONCLUSION AS TO CLAIMS AGAINST NATIONAL TITLE AND SARTAIN

The Court finds Plaintiffs did not meet their burden under the summary judgment standard as to all claims brought against National Title and Sartain. Accordingly, the Court will **GRANT** the motion for summary judgment filed by National Title and Sartain (Court File No. 118).

### V. CLAIMS AGAINST COOKE, PARKER, AND MILES

█ Regardless of the claim against Cooke, Parker, and Miles, the essential questions are: What was her role at DWCC and what did she know? The record reflects that Cooke, Parker, and Miles were little more than employees of DWCC. There are no facts to indicate that Cooke, Parker, and Miles acted in any capacity other than on behalf of Don Williams or DWCC when they talked and met with Plaintiffs either at the initial meetings or at the closings. There are no facts to indicate Cooke, Parker, and Miles knew of Don Williams' illegal activities or participated in those illegal activities.[14]

---

14. The Court questions a statement made in the Response to the Parker summary judgment motion. The statement reads: "The trier of fact makes the ultimate decision on the veracity and believability of a defendant. *Given the defen-* *dant's criminal record and her closeness to the transactions,* a rational trier of fact could choose to disbelieve the defendant and hold her liable" (Court File No. 135, p. 9).

There are no facts to indicate Cooke, Parker, and Miles had any reason to believe the representations they made to Plaintiffs regarding the warranty deeds were anything but accurate and true.[15]

■ Plaintiffs rely on the fact that Miles and Parker made certain representations to them in support of each of their claims (Court File No. 43, p. 2; Court File No. 135, pp. 6–10). Plaintiffs state Miles "is being sued because of her *knowing participation* in fraudulent business practices committed by [DWCC] as well as the other Defendants in the lawsuit" (Court File No. 43, p. 2) (emphasis added) and state they "have established ... that [Parker] was an *active participant in the fraudulent transactions* that duped them out of their property" (Court File No. 135, p. 10) (emphasis added). Assuming Miles and Parker made the representations, but without demonstrating more than their simple recitation of information they had no reason to believe was false, does not provide the necessary link to liability.[16] That they

made the representations does not *ipso facto* impute to them the knowledge of Don Williams' illegal activities or the ultimate falsity of the warranty deeds. Plaintiffs do not proffer evidence, which could lead a reasonable trier of fact to conclude Miles and Parker knowingly and actively participated in Don Williams' fraudulent scheme.

Plaintiffs rely on the facts that Cooke is Don and Alice Williams' daughter and that as secretary she "had access to the bank accounts, checkbooks, and financial information relative to DWCC and the activities of that organization" to contend that she "knew of, or had reason to know of, the fraudulent transactions being conducted by DWCC" (Court File No. 134, pp. 2–4); *see also* 18B *Am.Jur.2d,* Corporations § 1882, at pp. 730–31. Having a position as secretary does not automatically give one information about the activities of all other corporate officers. Moreover, Plaintiffs did not offer any proof of Cooke's responsibilities: there are no documents showing her signature on check stubs, payroll books, or office memoranda,

Presumably, simply because of context, the Defendant referenced is Parker. The only evidence clearly proffered to the court of anyone with a criminal record, though, is Don Williams. Indeed, nothing else in the Response indicates Parker has a criminal record. If the reference is to Parker, nothing else in the record clearly supports the statement. If the reference is to Don Williams, such imprecise writing should be corrected in order to avoid unintended conclusions.

**15.** The Court does not approve of the manner in which at least some of the oral depositions in this case were conducted. *See, e.g.,* Court File No. 126, Menuskin Dep., pp. 16–18, 30–40, 60–64, 70–81, 84–97, 129–132; Court File No. 127, Newman Dep., pp. 55–59, 71–73, 85–92, 105–107. When reading through the above-cited material for substantive or factual support, the Court had to sift through unnecessary, inappropriate, and disruptive commentary.

*Fed.R.Civ.P.* 30(c) and (d) guide an attorney's behavior during depositions. Rule 30(c) allows objections "to the manner of taking [the deposition], to the evidence presented, to the conduct of any party, or to any other aspect of the proceedings ... with the testimony being taken subject to the objections." Rule 30(c) also permits motions to compel an answer. *See* Wright, Miller & Marcus, *Federal Practice and Procedure: Civil 2d* § 2113 at pp. 92–94. Rule 30(d)(2) prohibits behavior that "impedes or delays the examination" and allows for "an appropriate sanction." Rule 30(d)(3) disallows conducting examinations "in bad faith or in such a manner as unreason-

ably to annoy, embarrass, or oppress the deponent or party." Significantly, Rule 30(d)(1) states:

Any objection to evidence during a deposition shall be stated concisely and in a non-argumentative and non-suggestive manner. A party may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation on evidence directed by the court, or to present a motion under paragraph (3).

Courts are increasingly monitoring attorney conduct during depositions. *See Van Pilsum v. Iowa State Univ. of Science and Tech.,* 152 F.R.D. 179 (S.D.Iowa 1993); *Johnson v. Wayne Manor Apts.,* 152 F.R.D. 56 (E.D.Pa.1993); *Castillo v. St. Paul Fire & Marine Ins. Co.,* 828 F.Supp. 594 (C.D.Ill.1992). Though not called upon in this case to review attorney conduct during the depositions, the Court unavoidably encountered that conduct as part of its normal study of the record. The behavior revealed is *not* that contemplated by *Fed.R.Civ.P.* 30(c) and (d) nor that otherwise befitting the legal profession.

**16.** Parker also cites *Holt v. American Progressive Life Ins.,* 731 S.W.2d 923, 925 (Tenn.Ct.App. 1987) for the proposition that an agent is not liable under a contract when the principal is disclosed unless the agent intended to be bound or assumed the obligations under the contract. Plaintiffs have not provided authority to counter this position. The Court finds the case persuasive and notes that the proposition fits well into the overall perception of this case.

and there is no adequate description of her duties. The Court is left to speculate on what exactly she did. Plaintiffs' citation to *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585 (Tenn.Ct.App.1980) is inapposite. In *Brungard,* the court found both defendants, a sales agent and the company president, acted fraudulently because they each knew of the false nature of the representations given to the plaintiff. *See id.* at 588–89, 590–91. Such is not the case with Cooke.

Both parties cited to *Fischer,* which bears a striking factual resemblance to this case. In *Fischer,* the evidence showed "that as a matter of policy of the corporation, construction loans were not shown on their contracts of sale because they paid them off after a sale and [the] salesman had no knowledge as to whether the properties were mortgaged or not, but that [he] was carrying out his orders when he advised the purchasers that no mortgage existed on the property they were buying and that they could depend on [the seller]." *Fischer,* 214 N.E.2d at 614. As in the case before the Court, the company president did not pay the prior construction loans. *Id.* The evidence showed the company president, "Kelly[,] admitted that he had created the situation without the knowledge of the other officers and employees, and admitted that he knowingly failed to pay off the mortgages." *Fischer,* 214 N.E.2d at 614.

The court reasoned that a person's status as a corporate officer or director does not create *per se* liability for the actions of other officers or directors. *Id.* at 615. That officer or director is liable only if he or she acts with knowledge, recklessly without knowledge, or participates or assists in the fraud. *Id.* at 615–16. The court dismissed the other officers and employee defendants and found only the president liable. *See id.* at 613, 617. Such is the case here. Plaintiffs have not shown that Cooke, Parker, and Miles were aware of nor should have been aware of Don Williams' fraudulent activities. Don Williams testified that only his wife knew about the failure to use the Plaintiffs' sales proceeds to pay off the First American construction loans.

## VI. CONCLUSION AS TO CLAIMS AGAINST COOKE, PARKER, AND MILES

Plaintiffs argue that each Defendant was an active participant in Don Williams' fraudulent scheme for several reasons. First, these Defendants told Plaintiffs a title company and an attorney would handle the title and legal work for the real estate transactions. Second, these Defendants told Plaintiffs the property was free and clear of encumbrances. Third, these Defendants signed documents relied upon by Plaintiffs. Lastly, these Defendants had to be aware of Don Williams' fraudulent scheme because they worked with him. However, the *Fischer* case is revealing. As in that case, the evidence does not demonstrate Cooke, Parker, and Miles knew about Don Williams' illegal scheme. Nor does the evidence show these Defendants would have reason to doubt the truth of their representations to Plaintiffs or to know about Don Williams' illegal scheme.

This ruling does not imply the Court does not recognize the loss suffered by Plaintiffs. The circumstances leading to this case were certainly unfortunate and tragic; an appreciation of this, though, does not cause liability to attach. Accordingly, the Court will **GRANT** the motions for summary judgment filed by Miles, Cooke, and Parker (Court File Nos. 24, 116, and 124, respectively).

An Order will enter.

### *ORDER*

In accordance with the accompanying Memorandum, the Court **GRANTS** the Motion for Summary Judgment filed by Defendants National Title Insurance Agency and J.P. Sartain (Court File No. 118). The Court also **GRANTS** the Motions for Summary Judgment filed by Defendant Cathleen N. Miles (Court File No. 24), by Defendant Vicki Cooke (Court File No. 116), and by Defendant Susan Parker (Court File No. 124). Remaining for adjudication are the claims brought against Defendants Don Williams and Alice Williams.

**SO ORDERED.**