HARRIET & HENDERSON YARNS, INC., Thomaston Mills, Inc., Unifi, Inc., McMichael Mills, Jefferson Mills, Inc., RDC, Inc., Mount Vernon Mills, Inc., Huskey Knitting Mills, Jacob Textile Sales, Jones Textile, Kings Mountain Hosiery Mills, Inc., Merlin Creel Systems, Inc., O'Mara, Inc., Pharr Yarns, Inc., Ruppe Hosiery, Inc., Plaintiffs,

v.

Renee E. CASTLE, Wolff Ardis, P.C., Defendants.

No. 97–3032 DA.

United States District Court, W.D. Tennessee, Western Division.

Dec. 3, 1999.

John L. Ryder, Apperson Crump & Maxwell, Memphis, TN, David H. Conaway, Bentford E. Martin, Blair Conaway Bograd & Martin, Charlotte, NC, Richard C. Kennedy, Jerrold D. Farinash, Kennedy Fulton Koontz & Farinash, Chattanooga, TN, for plaintiffs.

Russell E. Reviere, Rainey Kizer Butler Reviere & Bell, Jackson, TN, for defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DONALD, District Judge.

Before the court are Plaintiffs' motion for partial summary judgment and Defendants' motion for summary judgment. Plaintiffs' Amended Complaint includes six counts, and Plaintiffs have moved for partial summary judgment on the issue of liability as to four of those counts. For the reasons stated herein, Plaintiffs' motion is denied in its entirety. Defendants have moved for summary judgment as to the entire case. For the reasons stated herein, Defendants' motion is granted in part and denied in part.

### I. Background Facts

This is a complex case, featuring multiple parties and multiple claims. It arises out of the creation in 1995 of Star Hosiery, Inc. ("Star"). FLR Hosiery ("FLR") and Lora Lee Knitting ("Lora Lee") were two pre-existing Tennessee hosiery companies,

both experiencing financial difficulties in early 1995. Both companies were heavily indebted to trade creditors, most of whom supplied them with raw materials. Together they owed approximately $3,000,-000, much of it to Plaintiffs. Plaintiff RDC, Inc. was FLR's landlord. Plaintiffs Harriet & Henderson Yarns, Inc., Thomaston Mills, Inc., Unifi, Inc., McMichael Mills, Jefferson Mills, Inc., Mount Vernon Mills, Inc., Huskey Knitting Mills, Jacob Textile Sales, Jones Textile, Kings Mountain Hosiery Mills, Inc., Merlin Creel Systems, Inc., O'Mara, Inc., Pharr Yarns, Inc., and Ruppe Hosiery, Inc. were suppliers of yarn or textile services. Brookfield & Company ("Brookfield"), an investment banking firm, became involved with FLR and Lora Lee, assisting in the two companies' attempt to secure additional financing. Brookfield arranged a deal whereby FLR and Lora Lee would contribute substantially all their combined assets to form a new company, Star. Brookfield arranged for Congress Financial ("Congress") to finance the new company. Brookfield also engaged the Defendant law firm Wolff Ardis, P.C. ("Wolff Ardis") to represent Star during its creation, incorporation, and loan deal from Congress. Defendant Renee Castle ("Castle") was a shareholder in Wolff Ardis, and was the lead attorney for the Star transactions.

In order for Star to obtain financing from Congress, Brookfield advised that much of the pre-existing FLR and Lora Lee debt should be restructured into subordinated, convertible debenture notes ("Debenture Notes").[1] The Debenture Notes were to be paid by Star over three years. To induce the existing creditors to accept the Debenture Notes, the creditors were granted a second lien in Star's machinery and equipment to secure the Debenture Notes, behind a first lien held by Congress. The creditors were also told that the Star merger and financing plan would improve the likelihood that the cur-

rent debt would be paid off. As the creditors were informed about the proposed creation of Star, they were asked to sign confidentiality agreements, which prevented the creditors from sharing information or discussing the proposal.

Brookfield had Castle prepare the necessary documents. Castle drafted the Debenture Note based on a form given her by Brookfield. She also drafted the Indenture Agreement, based on a form in the Wolff Ardis computer files. The Debenture Notes provided that Star promised to pay various amounts to the different Debenture holders. They also named Wolff Ardis as trustee. Other relevant parts of the Debenture Notes included the following:

1. *Payment of Principal.* The total obligation of Star to all Debenture Holders is set forth in the Indenture Agreement dated as of December 1, 1995, by and between Star and Wolff Ardis P.C., as Trustee for the Debenture Holders (the "Indenture Agreement") ....

5. *Indenture Agreement.* This Debenture is one of several debentures of Star issued pursuant to the Indenture Agreement, the provisions of which are hereby incorporated by reference and made a part of this Debenture. All the Debentures issued pursuant to that Indenture Agreement are equally secured by a second lien and security interest in certain of Star's equipment, as more fully described in the Indenture Agreement. Reference is hereby made to the Indenture Agreement for a more detailed description of the property in which the Trustee holds a security interest, the nature and extent of the security interest, the rights and obligations of the Debenture Holder and other debenture holders, of Star, and of the Trustee.

6. *Events of Default.* One or more of the following events shall be deemed "Events of Default": (a) If any payment

---

1. A subordinated, convertible debenture note is a promissory note that is subordinated to other debt and that is convertible to stock at the holder's option. *See Pittsburgh Terminal Corp. v. Baltimore & Ohio R. Co.,* 680 F.2d 933 (3rd Cir.1982).

of principal and interest on this Debenture is not paid when due; provided that the Debenture Holder shall give Star written notice of such default and Star shall have sixty (60) days from receipt of such notice within which to cure such default; ...

The Indenture Agreement stated, in relevant part:

This Indenture Agreement between Star Hosiery, Inc., a Tennessee corporation (the "Company" or "Star") and Renee E. Castle of Wolff Ardis, P.C. having an address of 6055 Primacy Parkway, Suite 360, Memphis, TN 38119 (the "Trustee"), dated as of this 12th date of December, 1995 is for the benefit of certain holders of Debenture Notes ("Noteholders") who hold Debenture Notes issued pursuant to this Indenture.· Such Debenture Notes are collectively referred to herein as the "Debentures." The terms of the Debentures include those stated in the Note Debentures and those made part of the Note Debentures by reference to the Trust Indenture Act of 1939 (the "Trust Indenture Act") as in effect on the date of the Debentures ...

*Security.* The Debenture Notes shall be secured by a subordinate lien on all equipment owned by the Company. This lien shall extend on a pro rata basis to each Noteholder. It shall have a second priority (inferior to the liens securing Senior Indebtedness) on all equipment with the exception of the equipment presently encumbered by liens in favor of GECC, Speizman and Nations Bank, in which case the lien shall have a third priority....

*Events of Default.* One or more of the following events shall be deemed "Events of Default": (a) If any payment of principal and interest on this Debenture is not paid when due; provided that the Debenture Holder shall give the Company written notice of such default and the Company shall have sixty (60) days from receipt of such notice within which to cure such default; ...

*The Trustee.* The Trustee shall be under no obligation to exercise any of its rights or powers under this Indenture relating to any issue of Debentures at the request of any of the holders thereof, unless they shall have offered to the Trustee security and indemnity satisfactory to it....

The Debenture Notes prepared by Castle were sent to each Plaintiff in November, 1995 by FLR and Lora Lee, each for a varying amount. The Indenture Agreement was presented to Plaintiffs by their debtors as the best chance for them to recover the money owed them, and they were urged by FLR and Lora Lee to sign the Debenture Notes. Each Plaintiff did sign and return its Debenture Note. Once all Notes had been returned, Castle prepared the final Indenture Agreement, which stated that the total sum owed to the holders of the Debenture Notes pursuant to the Notes was $2,322,973.42.

The closing of the transactions occurred on December 12, 1995. At the closing were Defendant Castle and representatives of FLR, Lora Lee, Star, Congress, and Brookfield. None of the Plaintiffs had an attorney or other representative present. After the closing, copies of the signed Debenture Notes were sent to Plaintiffs, and the original Debenture Notes were kept in the offices of Wolff Ardis.

Castle had received instructions from Congress regarding the execution and filing of UCC–1 financing statements to perfect Congress' first lien in Star's equipment. Those financing statements, executed by Star in favor of Congress, were duly recorded with the Tennessee Secretary of State. However, there was never any discussion among any of the parties to the transaction about preparing or filing financing statements in favor of Plaintiffs. No UCC–1 financing statements were prepared, executed, or filed with regard to Plaintiffs' lien in Star's equipment. Because no financing statement was filed, the Debenture holders' lien was never properly perfected under Tennessee law.

Star made the required payments from January to June, 1996. However, it then stopped making payments, and on August 16, 1996, Star filed for Chapter 11 bankruptcy. Shortly thereafter, Plaintiffs learned that no financing statements had been filed on their behalf. Because the lien was unperfected, each Plaintiff was treated as an unsecured creditor in Star's bankruptcy case. Star's assets were sold in bankruptcy, resulting in full repayment to Congress, but only approximately a 3% dividend to Plaintiffs and other unsecured creditors. Plaintiffs contend that they would have received all or most of the debt owed to them under the Debenture Notes if their security interest in Star's equipment had been properly perfected.

## II. Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In other words, summary judgment is appropriately granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The party moving for summary judgment may satisfy its initial burden of proving the absence of a genuine issue of material fact by showing that there is a lack of evidence to support the nonmoving party's case. *Id.* at 325, 106 S.Ct. 2548. This in turn may be accomplished by submitting affirmative evidence negating an essential element of the nonmoving party's claim, or by attacking the opponent's evidence to show why it does not support a judgment for the nonmoving party. 10a Charles A. Wright et al., Federal Practice and Procedure § 2727, at 35 (2d ed. Supp.1996).

Facts must be presented to the court for evaluation. *Kalamazoo River Study*

*Group v. Rockwell Int'l*, 171 F.3d 1065, 1068 (6th Cir.1999). The court may consider any material that would be admissible or usable at trial. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721, at 40 (2d ed.1983). Although hearsay evidence may not be considered on a motion for summary judgment, *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999), evidentiary materials presented to avoid summary judgment otherwise need not be in a form that would be admissible at trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Thaddeus–X v. Blatter*, 175 F.3d 378, 400 (6th Cir.1999).

In evaluating a motion for summary judgment, all the evidence and facts must be viewed in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Walborn v. Erie County Care Facility*, 150 F.3d 584, 588 (6th Cir.1998). Justifiable inferences based on facts are also to be drawn in favor of the nonmovant. *Kalamazoo River*, 171 F.3d at 1068.

Once a properly supported motion for summary judgment has been made, the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). A genuine issue for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348.

## III. Analysis

The crux of this suit is Plaintiffs' claim that Defendants had the responsibility to

perfect Plaintiffs' security interests, or to ensure that the interests were perfected. Plaintiffs have filed six distinct complaints, and have moved for summary judgment on the issue of liability as to the last four. Defendants have moved for summary judgment as to all six claims. The court will discuss each claim in turn. Additionally, Defendants make two other summary judgment arguments which the court will address. Of course, Tennessee law governs the substantive questions raised by these motions. *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

## A. Professional Negligence and Professional Negligence Regarding Third–Party Beneficiaries of Attorney–Client Relationship

In their Amended Complaint, Plaintiffs make two separate negligence claims, one entitled Professional Negligence, and the other entitled Professional Negligence Regarding Third–Party Beneficiaries of Attorney–Client Relationship. As the court reads the many briefs submitted on this issue by both parties, it is clear that the two sides are not only disagreeing, but are not always addressing the same question. The court attempts to eliminate the chaff and focus on the substance of the claims.

### 1. There Was No Attorney–Client Relationship Between Plaintiffs and Defendants

■ Under Tennessee law, the general rule is that a plaintiff in a legal malpractice suit must establish (1) the employment of the attorney, (2) a negligent breach of duty by the attorney, and (3) actual damages resulting from the breach. *Tanner v. Caplin & Drysdale,* 24 F.3d 874, 878 (6th Cir.1994) (quoting *Blocker v. Dearborn & Ewing,* 851 S.W.2d 825, 827 (Tenn. Ct. App.1992)). Defendants argue that they were never employed as attorneys by Plaintiffs, and that in the absence of an attorney-client relationship, Plaintiffs' claim must fail. Plaintiffs do not actually dispute the factual point that they never hired Defendants to represent them. In-

stead, Plaintiffs cite legal authority for the point that Tennessee, in certain circumstances, allows non-clients to sue attorneys for professional negligence. The court will address those cases momentarily. *See* Sec. III(A)(5), *infra.* For now, the court finds that there was no attorney-client relationship between the parties, as Defendants never retained Plaintiffs to represent them.

### 2. Plaintiffs Were Not Third–Party Intended Beneficiaries of an Attorney–Client Relationship

■ Plaintiffs' second negligence claim is that Defendants breached a duty owed to Plaintiffs as intended third-party beneficiaries of the attorney-client relationship between Defendants and Star. As a general rule, an attorney may be liable for negligence only to clients or parties with whom the attorney is in privity of contract. *See, e.g., Stinson v. Brand,* 738 S.W.2d 186, 190 (Tenn.1987). The third-party beneficiary theory creates an exception to this general rule. In order to recover under the third-party beneficiary theory, a third party must show that he is the intended beneficiary of the contract between the attorney and client. *See, e.g., Pelham v. Griesheimer,* 92 Ill.2d 13, 64 Ill.Dec. 544, 440 N.E.2d 96,, 99 (1982); Restatement (Second) of Contracts § 302 (1981). The third party "must allege and prove that the intent of the client to benefit the nonclient third party was the primary or direct purpose of the transaction or relationship." *Pelham,* 64 Ill.Dec. 544, 440 N.E.2d at 99.

■ There are two problems with Plaintiffs' third-party beneficiary claim. The first is that Tennessee has never adopted this theory as a cause of action. Plaintiffs do not dispute this point, but instead cite Tennessee cases in which courts, without expressly adopting the third-party beneficiary theory, have found a cause of action for negligence against attorneys by nonclients. The court agrees that Tennessee law does permit negligence actions against

attorneys by non-clients, and it will address this issue below. *See* Sec. III(A)(5), infra.

■ The second problem with Plaintiffs' argument is that even if Tennessee had adopted the third-party beneficiary of an attorney-client relationship theory, Plaintiffs would have no cause of action under it. Plaintiffs offer no evidence to support a theory that the primary purpose of the relationship between Defendants and Star was to benefit Plaintiffs. Furthermore, it is completely contrary to common sense to suppose that Star would enter into a complex financial agreement with its creditors, and hire attorneys primarily to benefit those creditors. Accordingly, inasmuch as Tennessee has not adopted a third-party beneficiary of an attorney-client relationship theory, and as Plaintiffs have failed to show that they were the intended beneficiaries of the attorney-client relationship between Defendants and Star, Defendants' Motion for Summary Judgment as to Plaintiffs' claim of Negligence Regarding Third–Party Beneficiaries is **GRANTED.**

Defendants argue that since Plaintiffs did not have an attorney-client relationship with Defendants, and were not the intended beneficiary of the attorney-client relationship between Defendants and Star, the court's analysis should end here. As Plaintiffs accurately point out, however, Tennessee law allows recovery for attorney negligence by parties who are neither clients nor intended beneficiaries. Before proceeding to that analysis, there are two further preliminary points which must be addressed.

*3. Formality in Pleading is Not Required*

■ Defendants correctly point out that Plaintiffs' Amended Complaint alleges attorney negligence regarding third-party beneficiaries, but that the cases Plaintiffs cite in support of their argument against summary judgment do not discuss this theory. Defendants argue that "Plaintiffs alleged the elements of third-party beneficiary of attorney-client relationship, a narrow doctrine based on contractual principles that is not recognized in Tennessee. Plaintiffs should not now be allowed to set forth a new theory of liability that was not contained in their Complaint simply because they have had the opportunity to research and discover that the theories alleged in their Complaint are not ... recognized or applicable in Tennessee." (Defs.' Reply to Pls.' Memo. of Law in Opposition to Defs.' Mot. for Summ.J., p. 11). The court does not accept this narrow view of what is required in the complaint. The Federal Rules of Civil Procedure require only that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P.Rule 8(a). "The 'theory of the pleadings' doctrine, under which a complaint must proceed upon some definite theory and plaintiff must succeed on that theory or not succeed at all, has been all but abolished under the federal rules." *Fitzgerald v.Codex Corp.*, 882 F.2d 586, 589 (1st Cir.1989) (citing Charles A. Wright & Arthur R. Miller, 5 Federal Practice & Procedure, § 1219 (1969)). *See also In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir.1981); *Rohler v. TRW, Inc.*, 576 F.2d 1260, 1264 (7th Cir.1978). Plaintiffs' Amended Complaint satisfies the requirements of the Federal Rules of Civil Procedure.

*4. Plaintiffs' Claim is Not Barred by the Statute of Limitations*

In Tennessee, the statute of limitations in a legal malpractice action is one year from the date on which the cause of action accrues. Tenn.Code Ann. § 28–3–104. The Supreme Court of Tennessee has ruled that the time period begins to run only when each of two distinct elements has been satisfied: (1) the plaintiff must suffer an actual injury as a result of the defendant's negligence, and (2) the plaintiff must know or reasonably should have known that the injury was caused by defendant's negligence. *Carvell v. Bottoms*, 900 S.W.2d 23, 28–30 (Tenn.1995).

Plaintiffs filed this lawsuit on June 13, 1997. Defendants argue that the cause of action accrued in December, 1995, which is when the closing of the transaction that is the subject of this case occurred. Therefore, according to Defendants, seventeen months lapsed between the alleged negligence and the filing, and thus Plaintiffs' action is barred by the statute of limitations. Defendants' argument fails because they misidentify the date of injury. A cause of action does not accrue until the plaintiffs have suffered actual injury. *Id.* at 30. *See also Ameraccount Club, Inc. v. Hill,* 617 S.W.2d 876 (Tenn.1981). In this case, Plaintiffs did not suffer an actual injury until the distribution of Star's assets, or at the earliest, when Plaintiffs were classified as unsecured creditors after Star filed for bankruptcy in August, 1996. Thus Plaintiffs' lawsuit, filed in June, 1997, was filed within the statute of limitations period.

### 5. Defendants Will Not Be Granted Summary Judgment on Plaintiffs' Negligence Claim

Finally, the court addresses the merits of Plaintiffs' attorney negligence claim. The strongest authority in favor of Plaintiffs comes in the form of two decisions by the Supreme Court of Tennessee, *Stinson v. Brand,* 738 S.W.2d 186 (Tenn.1987), and *Collins v. Binkley,* 750 S.W.2d 737 (Tenn. 1988). The plaintiffs in *Stinson* brought a negligence suit against a law firm. *Id.* at 187. The plaintiffs had sold two houses they owned to a real estate broker, and were paid primarily in the form of a promissory note secured by a deed of trust. *Id.* at 187–88. The deed of trust conveyed the property from the purchaser of the property to the purchaser's attorney, acting as trustee. *Id.* at 188. The instruments were executed at the defendant law firm on the day of the transfer. *Id.* The plaintiffs were given the deed of trust and promissory note without any instructions. *Id.* at 188–89. The plaintiffs did not record the deed of trust. *Id.* The purchaser of the property failed to pay the note according to its terms. *Id.* at 189. The

property was then re-sold, and the new owners executed and recorded a new deed of trust on the property. *Id.* Subsequently, the real estate broker went into bankruptcy, and a suit was brought against the attorneys whose firm prepared the original legal instruments. *Id.*

The defendant attorneys argued that they had not advised or represented the plaintiffs. They also argued that they could not have done so responsibly since the purchaser of the property was their regular client. The Tennessee Supreme Court recognized "the general rule that an attorney is not liable for negligence to third parties who are not clients and are not in privity of contract with the attorney." *Id.* at 190. However, the Court then noted that there are exceptions, and found sufficient facts by which a jury could find negligence. The Court based its decision on three legal theories, under any one of which a jury could find that the attorneys breached a duty they owed to the plaintiffs. First, the Court cited *Tartera v. Palumbo,* 224 Tenn. 262, 453 S.W.2d 780 (1970), for the proposition that attorneys can be liable for negligently supplying false information for the guidance of others in their business transactions. *Id.* Second, the Court stated that "appellants so far involved themselves in the transaction that a trier of fact could find that they were representing multiple interests, not just the purchaser, and could be liable to appellees for negligence on that basis." *Id.* The Court based this theory in large part on the fact that one of the attorneys was named as trustee "to act for and on behalf of the holder of the note [i.e. the plaintiffs]." *Id.* Third, the Court noted that it was unclear who was to pay for the services of the attorneys, and that if a jury found that the law firm charged or intended to charge the plaintiffs for their services, then the attorneys would have been representing the property sellers. *Id.* at 191.

A few months after *Stinson,* the Tennessee Supreme Court revisited the issue

in *Collins, supra.* The plaintiffs in that case were real estate purchasers suing the attorney of the property seller. *Id.* at 737. The attorney had negligently prepared warranty deeds associated with the sale. *Id.* When the seller went into bankruptcy after the transfer of the property, the bankruptcy trustee successfully sued to void the deeds because they were defective. *Id.* at 738. Citing *Stinson,* the Court noted that there were alternative theories under which an attorney could be found liable for negligence to a non-client. *Id.* at 739. In *Collins* it was undisputed that the attorney was employed by the seller to prepare the deeds. *Id.* However, the Court found that there was sufficient evidence under which the attorney could be found negligent under the principles of the *Tartera* case cited in *Stinson. Id.* The Court stated, "[T]here was evidence that the attorney knew that plaintiffs would rely upon him and that it was his professional responsibility to prepare a valid warranty deed.... Further, there was evidence that the omission in the acknowledgment was below the standard of care required of an attorney preparing instruments for conveyance of real property. Those are the elements that give rise to the duty of an attorney to non-clients and may result in liability for the damages sustained by non-clients." *Id.*

Standing in opposition to the argument supported by *Stinson* and *Collins* is *Menuskin v. Williams,* 940 F.Supp. 1199 (E.D.Tenn.1996). In that case, the plaintiffs purchased some homes from a construction company. *Id.* at 1203. Only after the sale did they become aware of prior existing liens on the property, when the bank which held the liens moved to foreclose. *Id.* at 1206. Employees of the company had told the plaintiffs that the company's lawyer was taking care of the closing of the sale, and that plaintiffs did not need their own attorneys. *Id.* at 1204. Plaintiffs did not have their own attorneys at the closing. *Id.* Nor was the defendant attorney present at the closing. *Id.* at 1205. The plaintiffs did not assert that the attorney was even aware that repre-

sentations had been made that an attorney was "purportedly performing title and legal work on [their] behalf." *Id.* The attorney had been asked only to prepare warranty deeds, not to perform a title search or furnish title insurance, and had only been paid for preparing the warranty deeds. *Id.* at 1207.

The plaintiffs sued under a number of theories, of which their claims of negligence and negligent misrepresentation are relevant here. The district court granted summary judgment on the negligence claim. *Id.* at 1212. The court found that the attorney had been hired by the property seller for a limited duty only, i.e. preparation of the warranty deeds. *Id.* The plaintiffs had never met the attorney, and had failed to show that he was aware that construction company employees had implicated him "for a second and unapparent duty." *Id.*

The district court also granted summary judgment on the negligent misrepresentation claim. In that portion of its holding, the court addressed the implications of *Stinson* and *Collins.* The Menuskin court distinguished those cases by stating that the "level of involvement" of the attorney in the real estate transactions at issue did not rise to the level of the defendants in *Stinson. Menuskin,* 940 F.Supp. at 1215. The court went on to emphasize the element of foreseeability, stating, "It must be shown that the attorney should reasonably foresee that the non-client will rely upon him for legal services." *Id.* at 1216 (quoting *One Nat'l Bank v. Antonellis,* 80 F.3d 606 (1st Cir.1996)). The court also emphasized the potential conflict of interest problem with imposing a duty on attorneys to non-clients. The court expressed concern that such a duty could conflict with the duty owed to clients, or with attorney-client confidences. *Id.* at 1217 (citing *Antonellis; Abell v. Potomac Ins. Co.,* 858 F.2d 1104 (5th Cir.1988)).

 This court finds that its decision in the case at bar is controlled by *Stinson.* First, the facts of that case are most simi-

lar to this one. The plaintiffs in *Stinson*, like the plaintiffs here, faced a financial loss because they failed to record a document. 738 S.W.2d at 188–89. The defendant attorneys in *Stinson* had never advised or represented the plaintiffs. *Id.* However, they did prepare the documents. *Id.* And one of the attorneys in that case, as in this one, was named as trustee. *Id.* at 188. In addition, the reasoning of the *Stinson* Court applies here. In this case, as in *Stinson*, Defendants "so far involved themselves in the transaction that a trier of fact could find that they were representing multiple interests, ... and could be liable ... for negligence on that basis." *Id.* at 190.

Defendants attempt to distinguish *Stinson* in part by pointing out that Plaintiffs never paid any fees to Defendants. (Defs.' Reply to Pls.' Memo. of Law in Opposition to Defs.' Mot. for Summ.J., p. 12). However, the *Stinson* Court was clear that the possibility of payment was only one of three alternate grounds under which negligence could be found. It stated, "Even without charging the sellers, appellants may be found to have been acting for them by naming one of the appellants as trustee for the sellers." *Stinson*, 738 S.W.2d at 191. The same may be true here, where Castle was named as trustee for Plaintiffs. The fact that Castle was named as trustee is also an important distinguishing factor between the case at bar and *Menuskin.* In *Menuskin*, the defendant attorney only prepared documents. 940 F.Supp. at 1207. The *Menuskin* court distinguished that case from *Stinson* by focusing on the "level of involvement" of the attorney. *Id.* at 1215. The level of involvement of Defendants is the same as that of the defendants in *Stinson.* The *Menuskin* court was concerned about creating a conflict of interest by imposing a duty to non-clients. *Id.* at 1217. Here, however, Defendants themselves created that conflict. "Renee E. Castle of Wolff Ardis, P.C." was named in the Indenture Agreement as Trustee "for the benefit of certain holders of Debenture Notes." By filling the role of trustee for the Plaintiffs, Defendants placed themselves in a position in which they had a responsibility to protect the interests of Plaintiffs, and thus represented interests in conflict with those of their primary client, Star.

Defendants were deeply involved in the transaction, and that involvement included the role of trustee on behalf of Plaintiffs, a role into which Defendants placed themselves, and in which they represented interests contrary to those of their primary client. Therefore, the rationale of *Stinson* applies, and mandates that Defendants' Motion for Summary Judgment as to Plaintiffs' Negligence claim be **DENIED.**

**B. Breach of Contract**

 Both parties have moved for summary judgment as to Plaintiffs' breach of contract claim. Under Tennessee law, interpretation of the meaning of a contract is first a question of law to be decided by the court. *APAC–Tennessee v. J.M. Humphries Constr. Co.,* 732 S.W.2d 601, 604 (Tenn. Ct. App.1986). The court must decide as a matter of law whether the contract terms are ambiguous. *Tennessee Consol. Coal Co. v. United Mine Workers of Am.,* 416 F.2d 1192, 1198 (6th Cir.1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970). The language of a contract is ambiguous if its meaning is susceptible to more than one reasonable interpretation. *Farmers–Peoples Bank v. Clemmer,* 519 S.W.2d 801, 805 (Tenn.1975). If the terms are ambiguous, then the intended meaning of the contract becomes a question for the finder of fact. *Tenn. Consol. Coal Co.,* 416 F.2d at 1198. If the terms are unambiguous, the parties' intention is a question of law to be decided by the court. *Hamblen Cty. v. City of Morristown,* 656 S.W.2d 331, 336 (Tenn.1983). The contractual language should be given its usual, natural, and ordinary meaning, and neither party should be favored in the construction. *St. Paul Surplus Lines Ins. Co. v. Bishops Gate Ins. Co.,* 725 S.W.2d 948 (Tenn. Ct. App.1986).

The contract which Plaintiffs allege was breached was the Indenture Agreement, which by its terms incorporates the Debenture Notes. Neither the Indenture Agreement nor the Debenture Notes specifically calls for Defendants to prepare or file financing statements to perfect Plaintiffs' liens. Furthermore, it is undisputed that the parties never reached any oral agreement on this matter, or ever even discussed the issue of filing financing statements. Plaintiffs, however, argue that the contract implicitly provided that Defendants were to perfect Plaintiffs' security interests. They base their argument on the language in the Indenture Agreement stating that the agreement is made between Star and Castle "for the benefit of certain holders of Debenture Notes ..." Plaintiffs also focus on the following language from Paragraph 5 of the Debenture Notes:

All the Debentures issued pursuant to that Indenture Agreement are equally secured by a second lien and security interest in certain of Star's equipment, as more fully described in the Indenture Agreement. Reference is hereby made to the Indenture Agreement for a more detailed description of the *property in which the Trustee holds a security interest,* the nature and extent of the security interest, the rights and obligations of the Debenture Holder and other debenture holders, of Star, and of the Trustee (emphasis added).

Basing their argument on this language, Plaintiffs contend that "the clear implication of the parties' contract is that the defendants, as Indenture Trustee, will accomplish the perfection of the lien, as such action was required for defendants to properly 'hold' the security interest." (Memo. of Law in Opposition to Defs.' Mot. for Summ.J., p. 26).

The court is not persuaded. Absent some evidence to the contrary, contractual language should be accorded its ordinary meaning. *St. Paul Surplus,* 725 S.W.2d 948. Plaintiffs offer no legal authority to support their interpretation of the meaning of the verb "hold." Instead they merely argue in conclusory fashion that the duty to "hold" the security interests implied a duty to create, perfect, and protect the security interests. (Memo. of Law in Support of Pls.' Mot. for Summ.J., p. 15). However, nowhere in either the Indenture Agreement or the Debenture Notes is it provided that Plaintiffs were to receive a perfected security interest. Rather, Plaintiffs were granted a security interest and lien in Star's equipment, and that is precisely what Plaintiffs received. The creation of a security interest and the perfection of the interest are two separate and distinct events.

Plaintiffs correctly point out that under Tennessee law, ambiguous contract provisions are to be construed against the party responsible for the drafting. *See Hanover Ins. Co. v. Haney,* 221 Tenn. 148, 425 S.W.2d 590, 592–93 (1968); *Burks v. Belz–Wilson Properties,* 958 S.W.2d 773, 777 (Tenn. Ct. App.1997). The drafters in this case were the Defendants. However, whether contractual terms are ambiguous is a question of law for the court. *Tennessee Consol. Coal Co.,* 416 F.2d at 1198. The court does not find any ambiguity in the meaning of "hold." Aside from Plaintiffs' unsupported claims, there seems no reason to suppose that Defendants' duty to hold the security interests implied a duty to perfect them as well. In *CMI–Trading, Inc. v. Quantum Air, Inc.,* the Sixth Circuit affirmed a directed verdict against defendants who argued that a written contract between the parties was ambiguous. 98 F.3d 887 (6th Cir.1996). The court stated, "[A]t best, the contract is ambiguous only if the language in the note and agreement is given an unnatural and contrived construction.... Affidavits submitted by the defendants containing bald assertions of the parties' true intent constitute the only 'evidence.' Thus, the defendants make what amounts to an assertion rather than an argument." *Id.* at 892 (internal quotations omitted). The same could be said of the case at bar. Since there is no issue of genuine fact as

to whether Defendants were contractually obligated to perfect Plaintiffs' security interests, Defendants' Motion for Summary Judgment as to this claim is **GRANTED.** Plaintiffs' Motion for Summary Judgment is **DENIED.**

### C. Breach of Contract to Third–Party Beneficiaries

 In Tennessee, a claim of breach of contract to third-party beneficiaries must satisfy both prongs of a two-part test, namely (1) there must be a valid contract between the principal parties, and (2) the clear intent of the contract must be to benefit a third party. *Davidson & Jones Dev. Co. v. Elmore Dev. Co., Inc.,* 921 F.2d 1343, 1356 (6th Cir.1991). Given this court's holding (*See* Sec. III(B), supra) that there was no contractual duty to perfect Plaintiffs' security interests, this claim fails the first prong. Therefore there is no reason to consider the issue of whether Plaintiffs were intended third-party beneficiaries. Defendants' Motion for Summary Judgment is **GRANTED,** and Plaintiffs' Motion for Summary Judgment is **DENIED.**

### D. Breach of Fiduciary Duty

 Plaintiffs next allege that by not perfecting Plaintiffs' security interests, Defendants breached a state common law fiduciary duty owed to Plaintiffs. Defendants filled the role of trustee in this case, and Plaintiffs were the trust beneficiaries. Under Tennessee law, a trustee owes a duty of loyalty to the trust beneficiary. *Smail v. Smail,* 617 S.W.2d 889 (Tenn. 1981). A trustee also has a duty to act in good faith, with due diligence, and with care and skill. *Branum v. Akins,* 978 S.W.2d 554, 557 (Tenn. Ct. App.1998). Plaintiffs contend that Defendants had a fiduciary duty to ensure that Plaintiffs' interests under the Indenture Agreement and Debenture Notes were protected. Plaintiffs argue that Defendants breached this duty by failing to perfect the liens.

 This case does not deal with the duty of an ordinary trustee, but with the obligations of an indenture trustee. In arguing over the scope of those duties, the parties look primarily to caselaw from the state of New York, out of which most of the important cases on this topic have issued. The leading authorities make clear that, unlike those of an ordinary trustee, the duties of an indenture trustee are generally defined by and limited to the terms of the indenture. *See, e.g., Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,* 838 F.2d 66, 71 (2nd Cir.1988). *See also LNC Inv., Inc. v. First Fidelity Bank,* 935 F.Supp. 1333, 1346 (S.D.N.Y. 1996) ("Under New York law, the pre-default duties of an indenture trustee, unlike those of an ordinary trustee, generally are limited to the duties imposed by the indenture"); *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1415 (3rd Cir.1993) ("The courts of New York consistently have held that the duties of an indenture trustee, unlike those of a typical trustee, are defined exclusively by the terms of the indenture"); *Meckel v. Continental Resources Co.,* 758 F.2d 811, 816 (2nd Cir.1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement."); Hazen, *The Law of Securities Regulation* § 16.5, p. 154, n. 5 (West 1995) ("Despite some earlier cases that held that trustees may have pre-default liability beyond that put forth in the indenture, [it] is now well established that prior to default the trustee's responsibilities (and hence his/or her liability) are determined solely under the terms of the indenture agreement."); *First Interstate Bank of Denver, N.A. v. Pring,* 969 F.2d 891 (10th Cir.1992); *Shawmut Bank, N.A. v. Kress Assocs.,* 33 F.3d 1477 (9th Cir.1994).

That limits are imposed on the duties of an indenture trustee is not arbitrary, but reasonably based on the difference between the role of an indenture trustee and an ordinary trustee. One difference is that the rights and duties of an ordinary

trustee arise from the common law, whereas the duties of an indenture trustee arise out of, and thus are limited to, a contract. *Lorenz v. CSX Corp.*, 736 F.Supp. 650, 656 (W.D.Pa.1990) (aff'd. by 1 F.3d 1406 (3rd Cir.1993)). Another reason for the difference is that an indenture trustee must consider the interests of the issuer of the debenture as well as the beneficiaries. *In re E.F. Hutton Southwest Properties II, Ltd.*, 953 F.2d 963, 972 (5th Cir.1992). And a third reason is that "the purchaser of such debt is offered, and voluntarily accepts, a security whose myriad terms are highly specified. Broad and abstract requirements of a 'fiduciary' character ordinarily can be expected to have little or no constructive role to play in the governance of such a negotiated, commercial relationship." *Simons v. Cogan*, 542 A.2d 785, 786 (Del.Ch.1987).

The Indenture Agreement in this case said nothing about a duty of Defendants to perfect Plaintiffs' liens. Courts, however, have found two narrow exceptions to the general rule that the duties of an indenture trustee are strictly defined by the indenture agreement. One of these is that after default, "the loyalties of an indenture trustee no longer are divided between the issuer and the investors, and as a consequence ... the limits on an indenture trustee's duties before an event of default ... do not apply after an event of default ..." *LNC Inv.*, 935 F.Supp. at 1347. *See also Beck v. Manufacturers Hanover Trust Co.*, 218 A.D.2d 1, 632 N.Y.S.2d 520, 527 (N.Y.App.Div.1995) ("[E]ven if the responsibilities of an indenture trustee may be significantly more narrowly defined than those of an ordinary trustee while the obligation that it is the indenture's purpose to secure remains current, subsequent to the obligor's default ... the indenture trustee's obligations come more closely to resemble those of an ordinary fiduciary ..."). This post-default exception does not apply to the case at bar, in which the alleged breach of duty occurred prior to Star's default. Once Star had defaulted, it was already too late

for the security interests to be effectively perfected.

Plaintiffs contend that the other exception to the limits of an indenture trustee's duties applies here. That exception is the requirement that even indenture trustees have an obligation to avoid a conflict of interest. *See, e.g., LNC Inv.*, 935 F.Supp. at 1347 ("an indenture trustee must avoid conflicts of interest and discharge its obligations with absolute singleness of purpose") (internal quotations omitted); *Lorenz*, 1 F.3d at 1415 ("The sole exception to this rule [that the duties of an indenture trustee are defined exclusively by the terms of the indenture] is that the indenture trustee must avoid conflicts of interest with the debentureholders."); *Elliott*, 838 F.2d at 71 ("[S]o long as the trustee fulfills its obligations under the express terms of the indenture, it owes the debenture holders no additional, implicit pre-default duties or obligations except to avoid conflicts of interests.").

Plaintiffs argue that by assuming the role of trustee, Defendants created a conflict of interest, and thereby breached the fiduciary duty they owed to Plaintiffs. (Memo. of Law in Supp. of Pls.' Mot. for Partial Summ.J., p. 17). However, the existing legal authority in this area does not support Plaintiffs' argument that this dual role sufficed to impart additional fiduciary duties. In *In re E.F. Hutton*, the Fifth Circuit stated that "heightened fiduciary duties ... are not activated until a conflict arises where it is evident that the indenture trustee may be sacrificing the interests of the beneficiaries in favor of its own financial position. There must be a clear possibility of this evident from the facts of the case, e.g., where the indenture trustee is a general creditor of the obligor, who is in turn in financial straits. A mere hypothetical possibility that the indenture trustee might favor the interests of the issuer merely because the former is an indenture trustee does not suffice." 953 F.2d at 972. Similarly, the Second Circuit found no conflict of interest in *Elliott* when

it found that "except for bald assertions of conflict of interest, [the plaintiff] presents no serious claim that [the indenture trustee] personally benefitted in any way ..." 838 F.2d at 70. In the case before the court, Plaintiffs likewise have done no more than make bald assertions of a conflict of interest.[2]

Plaintiffs accurately point out that many of the cases finding no implied duties for indenture trustees involved indenture agreements containing clauses specifically excusing the trustee of any duty outside of those made explicit in the agreement. (Memo. of Law in Opp. To Defs.' Mot. for Summ.J., p. 33); see, e.g., Eldred v. Merchants Nat'l Bank of Cedar Rapids, 468 N.W.2d 221, 223 (Iowa 1991). This at least suggests that in the absence of such a clause, an indenture trustee could be held to a higher fiduciary standard. There was no such clause in the Indenture Agreement in this case. However, Plaintiffs are unable to direct the court to a single case in which, in the absence of such a disclaimer, a court has found that an indenture trustee has the same fiduciary duty as an ordinary trustee.

Plaintiffs also attempt to distinguish this case by virtue of the fact that the Defendants were the attorneys of the debenture issuer, as opposed to the financial institutions which served as trustees in many of the cited cases. Plaintiffs argue that where the trustees are attorneys of an obligor who will benefit at the expense of the trust beneficiaries, the trustees have a conflict of interest which violates their fiduciary duty. (Pls.' Surreply in Opp. To Defs.' Mot. for Summ.J., p. 11). However, Plaintiffs again are unable to produce any legal authority to back their argument, and there is no evidence to suggest that Defendants could have personally benefitted from the failure to file the financing statements.

Plaintiffs can successfully distinguish this case from any of the other individual cases on the fiduciary duties of indenture trustees. But what Plaintiffs ultimately ask this court to do is to find a new exception to well-settled law. This the court is unwilling to do. As a general rule, the duties of indenture trustees are strictly defined by the indenture agreement. There is no reason in this case not to follow that rule. The governing documents did not impose on the trustees the duty to perfect the security interests. Accordingly, Plaintiffs' Motion for Summary Judgment is **DENIED,** and Defendants' Motion for Summary Judgment is **GRANTED.**

### E. Breach of Obligations of the Trust Indenture Act of 1939

Plaintiffs' sixth and final complaint is that Defendants' failure to ensure that Plaintiffs' liens were perfected violated a provision of the Trust Indenture Act of 1939 ("Trust Indenture Act"). Before discussing that claim, the court must resolve the preliminary dispute over whether that Act applies to this case at all.

*1. The Indenture Agreement May Incorporate the Trust Indenture Act of 1939*

Plaintiffs contend that the Indenture Agreement incorporates by reference the Trust Indenture Act. Indeed, the Indenture Agreement states:

The terms of the Debentures include those stated in the Note Debentures and those made part of the Note Debentures by reference to the Trust Indenture Act

---

**2.** The court notes that in Sec. III(A)(5), supra, it held that Defendants placed themselves in a position of conflict of interest. That the court finds no actual conflict of interest here is not a result of inconsistency, but a function of differing legal standards. Tennessee allows claims of attorney negligence by non-clients where the attorneys get so deeply involved in a transaction "that a trier of fact could find

that they were representing multiple interests ..." *Stinson,* 738 S.W.2d at 190. On the other hand, heightened fiduciary duties of an indenture trustee arise only where there is clear evidence that the trustee personally benefitted from the conflict of interest. *In re E.F. Hutton,* 953 F.2d at 972; *Elliott,* 838 F.2d at 70.

of 1939 (the "Trust Indenture Act") as in effect on the date of the Debentures. The Debenture Notes, however, make no reference to the Trust Indenture Act. Defendants argue that the Trust Indenture Act therefore was not incorporated. Defendants claim that "the clear meaning" of the Indenture Agreement provision is that "[b]ecause there are no references to the Indenture Act contained in the debenture notes ... no Indenture Act provisions were incorporated by reference into the indenture transaction." (Memo. of Law in Supp. of Mot. for Summ.J., p. 48).

Defendants may find the meaning of this provision "clear," but the court does not. The language of a contract is ambiguous if its meaning is susceptible to more than one reasonable interpretation. *Farmers–Peoples Bank*, 519 S.W.2d at 805. If the terms are ambiguous, then the intended meaning of the contract becomes a question for the finder of fact. *Tenn. Consol. Coal Co.*, 416 F.2d at 1198. It is also true that where the language of the contract is ambiguous, it will be construed against the party responsible for the drafting (in this case, Defendants). *Hanover Ins. Co. v. Haney*, 221 Tenn. 148, 425 S.W.2d 590, 592 (1968).

Despite Defendants' contention to the contrary, the one thing that is clear about this provision is that it is ambiguous. Therefore, at the very least, the meaning should be left to be determined by the finder of fact. However, due to the court's ultimate disposition of this issue on another basis, it is unnecessary to decide this question. Instead, the court will assume arguendo that the Trust Indenture Act was incorporated into the Indenture Agreement.

### 2. The Trust Indenture Act Provides No Cause of Action for Plaintiffs

██ Plaintiffs state that the Trust Indenture Act requires an indenture trustee to review the filing and effectiveness of any lien intended to be created by the Debenture Notes. (Amended Compl., p. 11). According to Plaintiffs, this duty is imposed by 15 U.S.C.A. § 77nnn(b). Putting it simply, Plaintiffs either misunderstand or misrepresent the duty imposed by that section of the Trust Indenture Act. That section imposes two duties upon Star, the *obligor* of the indenture agreement. Furthermore, the duties imposed are for the benefit of the indenture trustee, i.e. Defendants. And finally, the duty it imposes is not to actually file the indenture, but merely to furnish an opinion of counsel as to whether the indenture has been properly recorded and filed. 15 U.S.C.A. § 77nnn(b). This section clearly does not impose a duty on indenture trustees to ensure that liens are perfected for the benefit of the debenture holders. Therefore the question of whether the Trust Indenture Act is incorporated into the Indenture Agreement is irrelevant. Because the Trust Indenture Act does not provide Plaintiffs with a cause of action under the facts of this case, Defendants' Motion for Summary Judgment on this count is **GRANTED,** and Plaintiffs' Motion for Summary Judgment is **DENIED.**

### F. Notice of Default Requirements

Defendants argue that they are entitled to summary judgment because Plaintiffs failed to abide by the default provisions of the Debenture Notes. Defendants maintain that when Star stopped making payments on the Debenture Notes, Plaintiffs were required by the express terms of the Debenture Notes to provide written notice of default to Star. Because some Plaintiffs failed to do so, Defendants argue, those Plaintiffs are not entitled to recover the debt.

██ The relevant provision of the Debenture Notes is Paragraph 6, entitled "Events of Default." It states in relevant part:

> One or more of the following events shall be deemed "Events of Default": (a) If any payment of principal and interest on this Debenture is not paid when due; provided that Debenture Holder shall give Star written notice of

such default and Star shall have sixty (60) days from receipt of such notice within which to cure such default; ...

Plaintiffs interpret this language to mean that Star's failure to pay is the "event of default," and that the written notice of default serves merely to activate Star's right to cure.

In support of their interpretation, Defendants focus on the words "provided that." They urge that the meaning of this language must be that the "event of default" is Star's failure to pay combined with the written notice from the debenture holder. However, there are reasons why the precise language used suggests that Plaintiffs' interpretation is correct. One is that there is a semi-colon before the word "provided." This separates the paragraph into two separate clauses, with the result that before even reading the second clause, the contract states that it is an event of default "if any payment of principal and interest on this Debenture is not paid when due." This interpretation is bolstered by the fact that the second clause twice refers to a "default" having already occurred by the time Star has an opportunity to cure. In other words, Defendants' interpretation makes sense only if "default" is a subset of "event of default." Given the proviso that ambiguous language is to be construed against the party responsible for the drafting, *Hanover Ins. Co.*, 425 S.W.2d at 592, the court holds that Star's obligations to Plaintiffs matured. Therefore Plaintiffs are entitled to recover their debts, and Defendants' Motion for Summary Judgment on this ground is **DENIED.**

## G. Harriet & Henderson

Defendants' final argument for summary judgment is relevant only to Plaintiff Harriet & Henderson Yarns, Inc. ("Harriet & Henderson"). Defendant contends that the money owed by Star to Harriet & Henderson under the Debenture Note was subject to a condition precedent which never occurred, and that the Debenture Note therefore was voided. Defendants' argument is based on a letter sent from Star to

Harriet & Henderson on November 22, 1995. The letter stated:

> Payment of the amounts due Harriet & Henderson shown on the enclosed schedule, showing a total due of $844,-264.34, adjusted for invoices from November 11, 1995 and for payments from November 13, 1995 in excess of the $600,000 being converted to the subordinated debenture will be paid within 90 days of our loan closing to the extent they are due under our normal 30–day terms. If these amounts are not paid within 90 days of closing the $600,000 debenture will become "Null and Void" and the total indebtedness to Harriet & Henderson will become due and payable.

Defendants point to the absence on Harriet & Henderson's payment records of any payment received from Star in the amount of $244,264.34, and argue that since Harriet & Henderson cannot prove the occurrence of the condition precedent, the Debenture Note became "Null and Void."

The parties do not disagree that in Tennessee a condition precedent may be waived by the party in whose favor it operates. *See Richardson v. Snipes*, 46 Tenn.App. 494, 330 S.W.2d 381, 385 (1959). Harriet & Henderson states that it waived Star's performance or accepted a modified performance. Charles Hall ("Hall"), Harriet & Henderson's Credit Manager, stated in his affidavit that Harriet & Henderson and Star agreed to modify the time and amount of payments due outside the Debenture Note. According to Hall, Star paid Harriet & Henderson $255,595.35 between January and June of 1996, and in so doing fully performed the parties' modified agreement. Harriet & Henderson's invoices support Hall's testimony. The actions of Harriet & Henderson and Star also support Hall's account of events. Payments continued to be made by Star through June 1996, suggesting that Star and Harriet & Henderson did not consider the Debenture Note to be null and void.

Defendants do not actually contest the legality or effectiveness of a modified and performed condition precedent. Instead, they argue that Hall's affidavit testimony contradicts his earlier deposition testimony. "Parties cannot defeat a motion for summary judgment by attempting to create genuine issues of material fact through affidavits ... that contradict their own depositions." *Tiller v. 84 Lumber Co.*, 886 F.2d 1316, 1989 WL 118736 (6th Cir.1989) (internal quotations omitted). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984). Defendants are correct that a party may not alter his testimony to avoid summary judgment, but they fail to establish that such an alteration occurred here. At his deposition, Hall testified that the non-Debenture debt was "paid or an arrangement was made for payment." (Hall deposition, p. 51). He testified that he believed that the agreed amount had been paid within the 90 day period. (Hall deposition, p. 50). He was sure the Debenture Note had not been canceled, but admitted that he could not remember the details regarding the payment. (Hall deposition, p. 50). Defendants argue that Hall was sure that the payment was made when he testified at his deposition, but that he then presented completely contradictory testimony in his affidavit. The record shows that Defendants' portrayal is simply inaccurate. Indeed, the record indicates that Star and Harriet & Henderson modified the condition precedent, and that Star met the modified condition. Therefore, Defendants' Motion for Summary Judgment is **DENIED.**

### IV. Conclusion

Based on all the foregoing, Defendants' Motion for Summary Judgment is granted as to Plaintiffs' claims of professional negligence regarding third-party beneficiaries, breach of contract, breach of contract to third-party beneficiaries, breach of fiduciary duty, and breach of obligations of the Trust Indenture Act. Defendants' motion is denied as to Plaintiffs' claim of professional negligence. Plaintiffs' Motion for Partial Summary Judgment is denied in its entirety.